DONALD SPECTER (SBN 83925)
KELLY KNAPP (SBN 252013)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com
kknapp@prisonlaw.com

Attorneys for Plaintiffs, *on behalf of themselves and others similarly situated*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| GEORGE TOPETE AND ZACHERY SHOVEY,<br><br>on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br>v.<br><br>COUNTY OF SAN BERNARDINO,<br><br>Defendant. | Case No. 5:16-CV-355<br><br>**PROPOSED CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

### NATURE OF THE ACTION

1.    San Bernardino County is violating the constitutional rights of the nearly 6,000 people it incarcerates in its jails.  Jail medical, mental health, and dental care is so deficient that it is harming the people it aims to serve.  Jail staff uses excessive force against people they are charged with protecting, and fails to take even the most basic steps to prevent violence.  Jail staff discriminates against people with disabilities by locking them in housing units that don't have accessible toilets and showers, and by locking people with mental health problems in tiny cells for 22 to 24 hours a day, which only worsens their psychiatric conditions.

2.    County officials have known for years that the conditions in the jails are so deplorable that people housed there are at significant risk of harm.  Yet the County has failed to take reasonable measures to mitigate the risk of harm faced by people entirely dependent on the County for basic health care, disability discrimination, safety, and security.

3.    Plaintiffs George Topete and Zachery Shovey, and the class they represent, seek a declaration that San Bernardino County's ongoing practices violate their constitutional and statutory rights, and seek injunctive relief compelling Defendant to provide constitutionally adequate health care, to protect people from violence, to provide equal access to programs, services, and activities, and to cease the unnecessary and excessive use of force.

### JURISDICTION

4.    The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

5.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; and 42 U.S.C. § 1983.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**VENUE**

6.     Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims brought by Plaintiffs and the class have occurred in this District and Defendant is located in this District.

**PARTIES**

**Plaintiffs**

7.     George Topete is a convicted prisoner and pretrial detainee who transferred from state prison to the West Valley Detention Center on October 14, 2011, to face new charges.  He has difficulty walking and using stairs due to a physical disability.  Mr. Topete requires the use of a cane, but Defendant has periodically refused to provide him with one for months at a time.  In June 2015, Defendant provided Mr. Topete with a wheelchair, but does not house him in a wheelchair accessible unit or cell.  As a result, he has fallen and is at risk of falling when trying to access the visiting area, his cell, and the toilet.  Defendant also denies Mr. Topete adequate access to a C-PAP machine that he requires to treat his sleep apnea.

8.     Zachary Shovey is a pretrial detainee in the West Valley Detention Center who was arrested on July 8, 2014.  He has an extensive psychiatric history that includes multiple suicide attempts, psychiatric medications, and a nine-month stay in a state psychiatric hospital.  Defendant failed to provide him mental health treatment and psychiatric medications for one year after his arrest despite symptoms including hallucinations, delusions, anxiety, and insomnia.  Defendant has also failed to provide him with timely medical treatment for his seizure disorder.

**Defendant**

9.     Defendant County of San Bernardino operates four jail facilities – West Valley Detention Center, Central Detention Center, High Desert Detention Center, and the Glen Helen Rehabilitation Center -- that incarcerate approximately 6,000

people.  Defendant also operates several detention facilities that incarcerate people for 96 hours or less.  The County is responsible for ensuring that the basic human needs of individuals in its custody are met, and for ensuring that individuals are not at risk of serious harm, including by providing appropriate funding, oversight, and corrective action to ensure adequate conditions.

## FACTUAL ALLEGATIONS

### I.   SAN BERNARDINO COUNTY FAILS TO PROVIDE ADEQUATE HEALTH CARE.

10.     Defendant subjects all people confined in the jails, including Plaintiffs, to a substantial risk of injury or death by failing to provide adequate medical, mental health, and dental care.  Individuals in the jails are entirely dependent on Defendant for their basic health care needs.  Defendant has a policy and practice of inadequately screening for serious health care conditions and disabilities, delaying access to clinicians and medications, understaffing health care professionals, delaying access to specialty care, and failing to provide the full array of services necessary to meet minimum standards of care.  Defendant is deliberately indifferent to the risk of harm caused by these serious health care deficiencies.

**A. Mental Health Care Is Inadequate.**

11.     Defendant's mental health care delivery system is deficient in staffing, screening, therapeutic treatment, suicide prevention, medication management, timely evaluations, recordkeeping, and confidentiality.

12.     There are not enough psychiatrists and therapists to meet the demands of the current jail population.  As a result, Defendant cannot implement the essential components of an adequate mental health delivery system.

13.     Upon arrival, untrained correctional officers, and not health care professionals, screen people for health care symptoms, including for mental illness and suicidality.  If the screening correctional officer manages to identify an individual as mentally ill, he or she is referred to mental health staff for an

evaluation.  However, this evaluation is often delayed, incomplete, and inadequate. The focus of the clinical evaluation is centered on any history of psychiatric medications, and the other necessary components of an adequate assessment (e.g., current symptoms, substance abuse, social history, and suicide history) are given short-shrift.

14.    Defendant does not have a functioning system to ensure timely access to mental health care.  Once housed, the primary method for people to request health care is to give a Health Service Request form ("HSR") to a correctional officer. This practice deters people from asking for help because custody staff may review their personal information, and many HSRs are lost or destroyed before reaching health care staff.

15.    For those individuals who manage to transmit a request for help to mental health staff, the treatment options are extremely limited.  There is no therapy. Instead, Defendant provides a brief, non-confidential, cell-front visit by a clinician, flanked by at least one correctional officer, typically several weeks after the individual first requested help, to assess if there are acute mental health symptoms. There is no effort to explore or treat the underlying mental health condition.  There is no effort to provide people with practical skills to help them cope with their symptoms or living conditions, including being locked in their cells for 23 or more hours a day, as is common practice.  Indeed, in August 2015, a jail therapist documented that Mr. Shovey was depressed and sleeping poorly, but the only treatment plan was to provide him with a list of outpatient clinics.   The brief cell-front visits often do not even address the symptoms described in the HSR that prompted the visit.  For example, even though a transgender woman had turned in at least two HSRs describing gender dysphoria in October 2015, the clinician who evaluated her in  November 2015 did not discuss gender dysphoria symptoms with her.

16.    Moreover, because these visits occur at cell-front within earshot of

1   other prisoners and custody staff, people are reasonably hesitant to divulge personal
2   information that may result in stigmatization and abuse.  Mr. Shovey, for example,
3   does not feel comfortable and has not disclosed all of his mental health symptoms to
4   jail clinicians because officers are present and other people can hear their
5   interactions.  Mr. Shovey has no history of violence or violent charges, and does not
6   pose any security threat that requires custody officers to stand next to his clinicians,
7   especially when they are speaking to him through a cell door.  For individuals in
8   administrative segregation, jail clinicians stoop over and speak to patients through
9   the food tray slot in the cell door even when there is no security risk involved in
10  opening the cell door and moving the patient to an appropriate clinical space.

11  17.   Defendant has a policy and practice of denying or delaying access to
12  psychiatrists.   Therapists generally operate as gatekeepers, and, based on
13  assessments they are not qualified to make, deny access to psychiatrists.  Defendant
14  denied Mr. Shovey access to a psychiatrist for over a year after his arrest, despite
15  serious mental health symptoms, because a therapist decided medications were not
16  warranted since he had not been receiving them in the months before he was
17  arrested.   Individuals who are referred to a psychiatrist must often wait several
18  weeks to be seen.  Once a jail clinician finally referred Mr. Shovey to a psychiatrist
19  because of symptoms including paranoia and mania, he had to wait five weeks and
20  file two grievance before a psychiatrist evaluated him.  People who are suffering
21  from severe symptoms must wait weeks or months before receiving psychiatric
22  medications.

23  18.   If and when Defendant provides psychiatry services, the treatment is
24  often haphazard and inconsistent.  Many people are denied medications entirely
25  until and unless they either threaten or attempt suicide.  Defendant does not always
26  provide a comprehensive psychiatry evaluation before prescribing or changing
27  powerful psychiatric medications, and fails to adequately monitor people prescribed
28  such medications for side effects, drug interactions, and effectiveness.

19.     Defendant's suicide prevention practices are dangerous and ineffective. If and when Defendant identifies an individual at risk of suicide, correctional officers force the individual to strip naked and lock him or her in a "safety cell," which is nothing more than a small jail cell with rubber coated walls, no furniture, and a hole in the floor to use as a toilet.  The individual is left in this cell for many hours, sometimes days, without any meaningful treatment until Defendant receives some assurance that the individual is no longer suicidal.  However, Defendant then abruptly releases such individuals back to their housing units without close monitoring of their symptoms and a without a timely follow-up appointment with a clinician.   People quickly cycle in and out of safety cells because they remain untreated.

20.     Defendant worsens people's psychiatric conditions by locking them in small cells for 22 hours or more a day, also known as "solitary confinement."[1]  As a result, they suffer from acute anxiety, depression, withdrawal, psychosis, agitation, and an increased risk of suicide or violence.  Defendant does not assess people with mental illness before placing them in solitary confinement to ensure their symptoms are not exacerbated or if they can be safely and adequately managed in such conditions.  Defendant also fails to monitor them or provide mental health services once they are locked in solitary confinement despite the well-known risks inherent in locking people in their cells for prolonged periods of time.

---

[1] *See* U.S. Department of Justice, Investigation of State Correctional Institution at Cresson, May 13, 2013, p. 5, available at http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf ("terms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with other."); *Wilkinson v. Austin*, 545 U.S. 209, 214, 224, 125 S.Ct. 2384, 2389, 2394 (2005) (describing solitary confinement as limiting human contact for 23 hours per day); *Tillery v. Owens,* 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day).

**B. Medical Care is Inadequate.**

21.     As described above, Defendant has a policy and practice of failing to adequately complete the most important encounter in a medical care delivery system – the intake screening.  An adequate intake screening is integral because it identifies medications, infectious diseases, and health care conditions that must be addressed to prevent injury and death.  Defendant assigns correctional officers to conduct the majority of the intake screenings.  These correctional officers are not qualified to recognize and respond to the signs and symptoms of serious medical conditions such as substance withdrawal or infectious diseases.  They are not qualified to identify, nor does Defendant verify, prescribed medications for individuals entering the jail, especially for those who are in extreme distress or under the influence of substances. They are not qualified, and the intake screening does not require them, to take vital signs (e.g., blood pressure and temperature).  Defendant also fails to conduct an intake screening for individuals who are transferred from other facilities to West Valley Detention Center for medical treatment, and instead sends them straight to housing units without any contact with medical staff.  Consequently, many people are later hospitalized for conditions that could have been prevented if appropriately identified and addressed at the intake screening.

22.     Defendant does not conform to the professional standard of care in the prevention and control of infectious diseases.  It fails to adequately screen for tuberculosis, a highly contagious and deadly disease with a high prevalence rate among people in Defendant's custody.  Defendant fails to provide adequate soap and sanitizers to staff and prisoners.  Defendant also does not adequately sanitize shavers and hair clippers that are shared by dozens of individuals.  Defendant's policies and practices create an unreasonable risk of the spread of infectious diseases.

23.     Defendant does not adequately assess, manage, or treat individuals suffering from substance withdrawal complications, and its policies and practices

regarding withdrawal do not conform to the professional standards of care.

24.   Defendant does not consistently respond in a timely manner, it if responds at all, to individuals who submit HSRs regarding serious medical conditions.  For example, Mr. Shovey submitted HSRs on February 22 and March 1, 2015, reporting recent seizures and that his seizure meds may need to be adjusted.  Medical staff did not respond to either HSR.  Indeed, Defendant did not evaluate him until April 3, 3015, when custody staff made an emergency call to nursing staff because Mr. Shovey was having a seizure.  Many of these types of emergencies, including those that require hospitalizations, could be avoided if Defendant had a policy and practice of timely responding to HSRs.

25.   Defendant does not have a functioning system to ensure that people receive timely access to specialty care and that specialists' treatment recommendations are provided.  Defendant provides many specialty services on site at the West Valley Detention Center, but then fails to arrange transportation to those services for individuals housed at the other jail facilities.  Those individuals wait months or are never rescheduled for the specialty services because Defendant does not have a tracking system to identify missed appointments.  In addition, the jail providers responsible for the overall care of the individuals needing specialty services fail to monitor them once referred, and thus do nothing when a specialty appointment is missed or when a specialist recommends treatment that must be ordered by the jail provider.  Similarly, Defendant does not have an effective system to timely receive diagnostic test results that are necessary for adequate treatment of serious medical conditions.

26.   Defendant has a policy and practice of failing to adequately review, document, or correct any deficiencies in care.  For individuals who die in custody, Defendant's practice is to gather records for at least eight to 12 months regarding the death, and then confer with its attorneys.  There are no documented findings or conclusions from the records.  There are no psychological autopsies of suicides.

Defendant does not interview or meet with custody and health care staff who may have been involved in a death.  There is no documented plan for corrective action. For individuals who do not die in custody, there is no assessment or evaluation of the overall quality of care, identification of problems or shortcomings in the delivery of care, corrective action to overcome these deficiencies, or follow-up monitoring to ensure corrective steps are effecitve.  Defendant's failure to implement an effective death review and quality assurance program results in a substantial risk of harm of preventable injury and death.

### C. Dental Care is Inadequate.

27.    Defendant has a policy and practice of denying the full range of dental services that is necessary to maintain dental health.  It does not, for example, provide root canals, dentures, or dental floss, even for those people who will be incarcerated for several years.  For those patients who require root canals, Defendant offers to extract teeth at no cost or refers the patient to a private dentist who charges the patient for hundreds or thousands of dollars for root canals and other treatment alternatives to save the teeth.  This practice forces many indigent people to extract teeth that might otherwise be saved.  Many people who do not have access to money in jail refuse extraction and wait in pain and discomfort with the hope that they can pay for the appropriate treatment alternative once released.  Those individuals, who may be incarcerated for long periods of time, are at risk of infection and further complications as a result of Defendant's policies and practices.  Defendant also fails to timely respond to HSRs describing serious dental symptoms.

### D. Health Care Records are Inadequate.

28.    Defendant has a policy and practice of failing to maintain accurate, complete, and organized medical, mental health, and dental records.  Defendant uses paper, instead of electronic, records that are not in chronological order or organized in such a way that providers can find essential information about their patients.

Some of the providers' handwriting is illegible, and many psychiatry records are unintelligible.   Defendant loses, misfiles, or inappropriately destroys essential records, including HSRs.   The records are not always available during health care appointments, especially when individuals are transferred to different jail facilities. As a result of Defendant's failure to maintain adequate records, individuals suffer from a substantial risk of misdiagnosis, dangerous mistakes, and unnecessary delays in care.

29.    Defendant also has a policy and practice of denying people copies of their own jail health care records in violation of 45 C.F.R. § 164.524.

## II.   SAN BERNARDINO COUNTY HAS A POLICY AND PRACTICE OF USING EXCESSIVE FORCE

30.    Defendant has a policy and practice of using excessive force in the jails that subjects people to serious injury or the risk of serious injury.   Correctional officers tase, fire non-lethal weapons at close range, punch, push, stomp, slam, or restrain individuals when it is not necessary  to ensure safety and security.   These assaults result in broken bones, dislocated joints, swelling, bruising, and hemorrhaging.

31.    Defendant has a pattern of using force as a first resort in reaction to any behavior that might possibly be interpreted as aggressive.   Force is used on people who are deemed, correctly or not, to have disrupted jail operations, disobeyed jail rules, complained about conditions, or disrespected jail staff.   In many instances, the use of force is completely unnecessary to control behavior or maintain order in the jails.   In some instances, the use of force may be necessary *initially*, but after the need for force has passed, the individual is subjected to retaliatory assault.

32.    These patterns of excessive force occur because Defendant does not adequately train, supervise, and discipline correctional officers.   These patterns also occur because Defendant's written policies and procedures are inadequate.   For example, Defendant's policies do not require that officers first attempt to verbally

10

resolve or use only the minimum force necessary to stop or control a potentially dangerous interaction.   Officers are not required to document every use of force incident, and not all use of force incidents are reviewed by supervisory staff. Defendant's policies do not include any limitations on the use of force against people who are unable to comply with commands due to severe mental illness, or the use of restraints on people who are vulnerable to injuries, including pregnant women.  There is no system for people in custody to confidentially report excessive use of force.

33.    All people in the jail, including Plaintiffs, are at risk of harm due to Defendant's policies and practices regarding the use of force.

### III.    SAN BERNARDINO FAILS TO PROTECT PEOPLE FROM VIOLENCE

34.    People in Defendant's custody face a substantial risk of harm from violence at the hands of other incarcerated people due to its policy and practice of failing to adequately supervise and classify people in its custody.   Vulnerable individuals are regularly assaulted and victimized by other individuals in the facilities or during transportation because Defendant has failed to take reasonable measures to protect them. Defendant is deliberately indifferent to the danger of assault faced by people in its custody.

35.    Given the structural design of the housing units, there are not enough correctional officers assigned to each unit to adequately supervise people.  In West Valley Detention Center, officers are stationed in an enclosed control booth that overlooks several separate housing pods.   Officers cannot see all areas of the housing pods from the control booth, and there are substantial periods of time when there are no officers in the pods.   As a result, people are often assaulted in the housing units when officers are not looking or present.   In February 2015, Mr. Topete was assaulted during a riot in his housing unit when there were no officers present.   Defendant knew the riot was going to happen because an individual wrote

a note to correctional officers about the planned riot, but nothing was done to prevent it.  During the riot, Mr. Topete tried to avoid the fighting by standing next to the door where the officers would enter.  While he stood there, he was punched in the face, hit with a milk crate, and hit with a plastic bedframe before he finally used his cane to keep attackers away from him.  Correctional officers did not enter the housing pod until several minutes later.

36.    Defendant does not adequately classify and assign people to housing locations where they will be safe from injury and violence.  Individuals who are incompatible are regularly housed together.  For example, in September 2015, a gang member was stabbed repeatedly in his cell by a rival gang member.  Defendant moved the victim to another housing unit for a few days, but then moved him back to the same housing unit where he was again stabbed repeatedly.  Defendant knew that one or both of these assaults was going to occur because correctional officers intercepted a note discussing the planned attack.  In other instances, people who notify staff that they are gang "drop-outs" are housed with the general population, instead of in protective custody, where they are attacked by active gang members.  People who are obviously psychotic and unstable are also housed with the general population where they assault or are assaulted by other individuals.

37.    Even when Defendant properly classifies people, they face an unreasonable risk of violence when they leave their housing units.  Individuals with different classifications are placed together in holding cells when they wait for court hearings or other appointments and in vehicles when they are transported to other locations such as the courthouse, hospital, or other jail facilities.  What is more, individuals with different classifications are chained together in these holding cells and vehicle transports.  A significant percentage of assaults occur outside of the housing units.

38.    When individuals notify staff members that they are at risk of assault, Defendant fails to adequately respond and ameliorate the risk.  Correctional officers

laugh at or ignore them, tell them that they have no choice but to "get along," or in some instances even encourage them to fight when they notify them of a risk of violence.  Correctional officers do not arrive on the scene of an attack until it is completed, if they are ever aware of an attack at all.

39.    As a result of these policies and practices, there is a high rate of violence, and people are suffering from serious injuries.  In fact, most people who are assaulted require medical attention, oftentimes at an off-site emergency room. Defendant has failed to take reasonable measures to mitigate this harm, and, as a result, a culture of violence between incarcerated individuals flourishes.

## IV.    DEFENDANT DISCRIMINATES AGAINST PEOPLE WITH DISABILITIES

40.    Defendant has a policy and practice of failing to ensure that people with disabilities have equal access to programs, services, and activities in the jails.

41.    At the time of intake, Defendant does not appropriately identify individuals' disabilities and needed assistive devices.  Defendant's intake screening form does not include any questions about physical disabilities, and there is no place to document if an individual requires a cane, wheelchair, walker, or accessible housing.

42.    Defendant does not timely provide appropriate assistive devices, including but not limited to wheelchairs, walkers, crutches, canes, braces, and hearing aids, to people who require them, if they ever provide them at all.  For example, a jail physician ordered a four-wheeled walker for a woman with a mobility impairment in March 2015.  She did not receive the walker until over three months later, and then only after Plaintiffs' counsel repeatedly asked Defendant to provide it.

43.    After intake, Defendant does not house people with physical disabilities in locations where they can safely programs and services.  For example, Defendant does not house Mr. Topete, who uses a wheelchair, in an accessible housing unit.

His wheelchair does not fit through his cell door, which means he must stand up, fold his wheelchair, push it through the doorframe, and then unfold the wheelchair again once inside. There are no grab bars next to the toilet inside his cell or the shower. Defendant forces him to go up and down stairs, without any assistance, to access the visiting room to visit his family. Once he reaches the top of these stairs, Defendant does not provide him with his wheelchair that remains on the floor below. Mr. Topete has fallen and it at risk of serious injury as a result of Defendant's failure to accommodate him. Defendant does not have enough housing units equipped with accessible features to meet the needs of its current jail population.

44. Defendant violates the rights of people with psychiatric and/or intellectual disabilities by housing them in solitary confinement. Solitary confinement, or locking people in their cells for 22 hours a day or longer, can be traumatic for everyone, but even more traumatic for people with psychiatric and/or intellectual disabilities. Defendant has not modified its policies and procedures to accommodate people with such disabilities so that they do not suffer harm from solitary confinement. Defendant locks people with psychiatric and/or intellectual disabilities in solitary confinement for nonconforming and erratic behaviors related to their conditions, some of which could have been avoided if Defendant provided adequate mental health care or accommodations. The harsh conditions and the lack of mental health care or accommodations cause them to continue and escalate these symptomatic behaviors. In response, Defendant locks them in solitary confinement for longer periods of time. Defendant's policy and practice of locking people with psychiatric and/or intellectual disabilities in solitary confinement, based on their disabilities, inappropriately deprives them of access to programs, services, and activities that are only available in less restrictive settings.

45. Defendant does not provide timely or adequate access to medical supplies or equipment for people with physical disabilities. People who require

14

colostomy supplies are at risk of infections because Defendant does not consistently deliver the appropriate supplies.  Mr. Topete, in addition to a wheelchair, requires the use of a C-PAP machine to sleep at night.  Defendant currently houses him in a cell that does not have an electrical outlet, and requires him to sleep in the dayroom if he wants to plug in his C-PAP machine.  Defendant also requires Mr. Topete to drag a plastic bedframe and mattress to and from storage, without assistance, many evenings and the following mornings.  Once Mr. Topete manages to get his bed into the dayroom, he has difficulty getting in and out of the bed because the frame sits directly on the ground and it is difficult for him to bend and stoop.  At least a few times a month, Mr. Topete wakes up choking and gasping for air because correctional officers have turned off the power in the dayroom and he cannot breathe through his C-PAP machine without electricity.

46.     Defendant does not have an effective complaint procedure for people to contest disability discrimination.  The only mechanism Defendant provides to raise disability issues is the jail grievance form.   However, individuals must ask correctional officers for grievance forms who often refuse to provide them. Defendant requires correctional officers to review and sign any grievances before they are processed, but many officers attempt to dissuade prisoners from filing them, threaten retaliation for use of the grievance process, or refuse to sign or process the forms.   Moreover, many people with disabilities are unaware of Defendant's obligation to ensure equal access to programs, services, and activities because Defendant has failed to provide notice of their disability related rights as required by federal law.

47.     Defendant's policies and procedures regarding screening, housing, assistive devices and medical supplies, grievances, and the use of solitary confinement for people with disabilities is a direct violation of the ADA and Section 504 of the Rehabilitation Act.

**V.    CLASS ALLEGATIONS**

48.    Plaintiffs George Topete and Zachery Shovey bring this action on their own behalves and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all people who are or will in the future be incarcerated in the San Bernardino County Jail.

49.    All  class members are at risk of harm due to the following policies and practices:

(a) Using force that subjects people to serious injury or the risk of serious injury even when it is unnecessary to control behavior or maintain order in the jails;

(b)  Denying minimally adequate health care including identification and monitoring of serious conditions, sufficient staffing levels, timely access to appropriate clinicians, medications, and treatment plans, effective suicide prevention practices, and the complete range of health care services necessary to maintain health;

(c)    Failing to adequately supervise and classify individuals to ensure that they do not face an unreasonable risk of injury and violence from other incarcerated individuals;

People with disabilities also face the additional risk of disability discrimination due to Defendant's inadequate policies and practices regarding solitary confinement, assistive devices and medical supplies, accessible housing, and grievances.

50.    There are questions of law and fact common to the class including whether Defendant by its policy and practice of (1) denying minimally adequate mental health, medical, and dental care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (2) using excessive force violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth

Amendment; (3) denying adequate supervision and classification to protect people from violence violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (4) denying assistive devices, medical supplies, and accessible housing to people with physical disabilities violates the ADA and Section 504 of the Rehabilitation Act; and (4) locking people with psychiatric disabilities and/or intellectual disabilities in solitary confinement based on their disabilities violates the ADA and Section 504 of the Rehabilitation Act.

51.   Since there are thousands of class members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for Defendant.

52.   Defendant has acted and failed to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

53.   Plaintiffs' claims are typical of the claims of the class, since their claims arise from the same policies, practices, and courses of conduct and their claims are based on the same theories of law as the class's claims.

54.   The named Plaintiffs, through counsel, will fairly and adequately protect the interests of the class.  Plaintiffs do not have any interests antagonistic to the plaintiff class.  Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendant.  Further, Plaintiffs are represented by counsel experienced in prisoners' rights litigation and complex class action litigation.

## CLAIMS FOR RELIEF

### First Cause of Action
### (Fourteenth Amendment - Cruel and Unusual Conditions, 42 U.S.C. § 1983)

55.   Plaintiffs incorporate by reference each and every allegation contained

17

in the

preceding paragraphs as if set forth fully herein.

56.   By the policies and practices described herein, Defendant subjects Plaintiffs and the class to a substantial risk of serious harm and injury from inadequate health care, violence between prisoners, and excessive force, and has violated their right to basic human dignity and to be free from cruel and unusual conditions under the Fourteenth Amendment to the United States Constitution. These policies and practices have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause of the Plaintiffs' and the class's ongoing deprivation of rights secured under the Fourteenth Amendment.

57.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.  It should be obvious to Defendant and to any reasonable person that the conditions imposed on class members for many months or years cause tremendous mental anguish, suffering, and pain to such individuals.   Moreover, Defendant has repeatedly been made aware, through administrative grievances and written complaints, that class members are currently experiencing, or are at risk of, significant and lasting injury.

**Second Cause of Action**
**(Eighth Amendment – Cruel and Unusual Punishment, 42 U.S.C. § 1983)**

58.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 - 54 as if set forth fully herein.

59.   By the policies and practices described herein, Defendant subjects Plaintiffs and the class to a substantial risk of serious harm and injury from inadequate health care, violence between prisoners, and excessive force, and has violated their right to be free from cruel and unusual punishment under the Eighth

18

Amendment to the United States Constitution.  These policies and practices have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause of the Plaintiffs' and the class's ongoing deprivation of rights secured under the Eighth Amendment.

60.    Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.  It should be obvious to Defendant and to any reasonable person that the conditions imposed on class members for many months or years cause tremendous mental anguish, suffering, and pain to such individuals.   Moreover, Defendant has repeatedly been made aware, through administrative grievances and written complaints, that class members are currently experiencing, or are at risk of, significant and lasting injury.

### Third Cause of Action
### (Americans with Disabilities Act)

61.    Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 - 54 as if set forth fully herein.

62.    Plaintiffs Topete and Shovey and other class members with physical, psychiatric, or intellectual disabilities are qualified individuals with disabilities as defined in the ADA.  They have an impairment that substantially limits one or more major life activities, they have a record of such impairment, or they are regarded as having such an impairment.   All people with disabilities in the jails meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant.  42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

63.    Defendant is a public entity as defined under 42 U.S.C. § 12131(1)(A).

64.    Defendant violates the ADA by failing to ensure that people with disabilities have access to, are permitted to participate in, and are not denied the

1  benefits of, programs, services, and activities.   42 U.S.C. § 12132; 28 C.F.R. §
2  35.152(b)(1).

3      65.   Defendant violates the ADA by failing to make "reasonable
4  modifications in policies, practices, or procedures when the modifications are
5  necessary to avoid discrimination on the basis of disability . . . ."  28 C.F.R. Section
6  35.130(b)(7).

7      66.   Defendant violates the ADA by failing to "ensure that inmates or
8  detainees with disabilities are housed in the most integrated setting appropriate to
9  the needs of the individuals."  28 C.F.R. § 35.152(b)(2).

10     67.   Defendant violates the ADA by failing to "furnish appropriate auxiliary
11  aids and services where necessary to afford individuals with disabilities an equal
12  opportunity to participate in … a service, program, or activity of a public entity." 28
13  C.F.R. § 35.160(b)(1).

14     68.   Defendant violates the ADA by failing to notify people about their
15  rights under the ADA while detained in its jails.  28 C.F.R. § 35.106.

16     69.   Defendant violates the ADA by failing to "adopt and publish grievance
17  procedures providing for prompt and equitable resolution of complaints alleging any
18  action that would be prohibited by … [the ADA]."  28 C.F.R. § 35.107(b).

19     70.   As a result of Defendant's policies and practices regarding people with
20  disabilities in its jails, Plaintiffs Topete and Shovey and other class members with
21  disabilities do not have equal access to jail activities, programs, and services for
22  which they are otherwise qualified.

**Fourth Cause of Action**
**(Section 504 of the Rehabilitation Act)**

25     71.   Plaintiffs incorporate by reference each and every allegation contained
26  in Paragraphs 1 - 54 as if set forth fully herein.

27     72.   Plaintiffs Topete and Shovey and other class members with disabilities
28  are qualified individuals with disabilities as defined in Section 504 of the

20

1    Rehabilitation Act, 29 U.S.C. § 794.

2        73.   Defendant receives federal funding within the meaning of the

3    Rehabilitation Act.

4        74.   Defendant violates Section 504 of the Rehabilitation Act by

5    discriminating against people with disabilities solely on the basis of their

6    disabilities.  29 U.S.C. § 794.

7        75.   Defendant violates Section 504 of the Rehabilitation Act by failing to

8    reasonably accommodate people with disabilities in its facilities, programs,

9    activities, and services.

10       76.   Defendant's policy and practice of discriminating against people with

11   psychiatric and/or intellectual disabilities in the use of solitary confinement is not

12   reasonably related to legitimate penological interests because (1) it worsens their

13   psychiatric conditions; (2) there are no alternative means for them to access

14   programs, services, and activities; (3) there are alternative means to safely and cost-

15   effectively house them in the jails; and (4) it is an exaggerated response as they do

16   not require restrictive housing on the basis of their disabilities.

17                            **PRAYER FOR RELIEF**

18       77.   Plaintiffs and the class they represent have no adequate remedy at law

19   to redress the wrongs suffered as set forth in this complaint.  Plaintiffs have suffered

20   and will continue to suffer irreparable injury as a result of the unlawful acts,

21   omissions, policies, and practices of the Defendant as alleged herein, unless

22   Plaintiffs are granted the relief they request.  The need for relief is critical because

23   the rights at issue are paramount under the Constitution of the United States, the

24   ADA, and Section 504 of the Rehabilitation Act.

25       78.   WHEREFORE, Plaintiffs on behalf of themselves and the class they

26    represent, request that this Court grant them the following relief:

27       A. Declare the suit is maintainable as a class action pursuant to Federal Rule

28   of Civil procedure 23(a) and 23(b)(1) and (2);

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

B. Adjudge and declare that the conditions, acts, omissions, policies, and practices of Defendant and its agents, officials, and employees are in violation of the rights of Plaintiffs and the class they represent under the Fourteenth and Eighth Amendments to the U.S. Constitution, the ADA, and Section 504 of the Rehabilitation Act;

C. Enjoin Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

D. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide minimally adequate mental health, medical, and dental care, including but not limited to sufficient intake screening, sufficient staffing, timely access to appropriate clinicians, timely prescription and distribution of appropriate medications and supplies, timely access to specialty care, and timely access to competent therapy, inpatient treatment, and suicide prevention;

F. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the excessive use of force.  Defendant's plan at a minimum must address deficiencies in use of force policies and procedures, training, supervision, investigations, and disciplinary practices;

G. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to develop and implement, as soon as practical, a plan to reduce the risk of injury and violence between individuals in its custody.  Defendant's plan at a minimum must address deficiencies in classification policies and procedures, staffing levels, and policies and practices related to the transportation of people in its custody;

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

G. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide equal access to programs, services, and activities for people with disabilities, including but not limited to housing people with physical disabilities in accessible housing appropriate to their needs, timely delivery of and appropriate access to assistive devices and medical supplies, housing people with psychiatric and/or intellectual disabilities in the least restrictive and most integrated settings appropriate to their needs, providing an effective grievance system to contest disability discrimination, and notifying people with disabilities their rights under the ADA and Section 504 of the Rehabilitation Act.;

I. Award Plaintiffs, pursuant to 29 U.S.C. § 794, 42 U.S.C. §§ 1988, 12205, and 12133, the costs of this suit and reasonable attorneys' fees and litigation expenses;

J. Retain jurisdiction of this case until Defendant has fully complied with the orders of this Court, and there is a reasonable assurance that Defendant will continue to comply in the future absent continuing jurisdiction; and

K. Award such other and further relief as the Court deems just and proper.

Dated:  February 29, 2016                PRISON LAW OFFICE

By: _/s/ Kelly Knapp_

DONALD SPECTER
KELLY KNAPP
Attorneys for Plaintiffs

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**