DONALD SPECTER (SBN 83925)
MARGOT MENDELSON (SBN 268583)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com
mmendelson@prisonlaw.com

Attorneys for Plaintiffs, *on behalf of themselves and others similarly situated*

FILED
CLERK, U.S. DISTRICT COURT

NOV 18, 2016

CENTRAL DISTRICT OF CALIFORNIA
BY:_____BH_____DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION - RIVERSIDE

RAHSHUN TURNER, MONIQUE
LEWIS, JAIME JARAMILLO, and
JOSHUA MILLS on behalf of themselves
and all others similarly situated,

*Plaintiffs*,

v.

COUNTY OF SAN BERNARDINO,

*Defendant*.

Case No. 5:16−cv−00355−VAP−DTB

**CLASS ACTION**

**SECOND AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**NATURE OF THE ACTION**

1. San Bernardino County is violating the constitutional rights of the nearly 6,000 people it incarcerates in its jails. Jail medical, mental health, and dental care is so deficient that it is harming the people it aims to serve. Jail staff uses excessive force against people they are charged with protecting, and fails to take even the most basic steps to prevent violence. Jail staff discriminates against people with disabilities by locking them in housing units that don't have accessible toilets and showers, and by locking people with mental health problems in tiny cells for 22 to 24 hours a day, which only worsens their psychiatric conditions.

2. County officials have known for years that the conditions in the jails are so deplorable that people housed there are at significant risk of harm. Yet the County has failed to take reasonable measures to mitigate the risk of harm faced by people entirely dependent on the County for basic health care, prevent disability discrimination, and ensure safety and security.

3. Plaintiffs Rahshun Turner, Monique Lewis, Jaime Jaramillo, and Joshua Mills and the class they represent seek a declaration that San Bernardino County's ongoing practices violate their constitutional and statutory rights, and seek injunctive relief compelling Defendant to provide constitutionally adequate health care, to protect people from violence, to provide equal access to programs, services, and activities, and to cease the unnecessary and excessive use of force and the harmful, excessive use of solitary confinement.

**JURISDICTION**

4. The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343,

**SECOND AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1 | 2201, and 2202; and 42 U.S.C. § 1983.

2 | **VENUE**

3 | 6.     Venue is proper in the Central District of California under 28 U.S.C. §

4 | 1391(b) because a substantial part of the events or omissions giving rise to the claims

5 | brought by Plaintiffs and the class have occurred in this District and Defendant is located

6 | in this District.

7 | **PARTIES**

8 | **Plaintiffs**

9 | 7.     Rahshun Turner is a pretrial detainee in custody at High Desert Detention

10 | Center.  Mr. Turner has been housed in an administrative segregation unit for over a year.

11 | On a typical day, Mr. Turner is locked in his cell for twenty three and a half hours.  Mr.

12 | Turner is experiencing anxiety, agitation, and depression as a result of the long-term

13 | isolation.

14 | 8.     Monique Lewis is a convicted prisoner in custody at West Valley Detention

15 | Center.  Ms. Lewis has an extensive psychiatric history that includes suicide attempts,

16 | psychiatric medications, and placement in a state psychiatric hospital.  Ms. Lewis has an

17 | intellectual disability.  She also suffers from Type 2 diabetes.

18 | 9.     Jaime Jaramillo is a pretrial detainee in custody at West Valley Detention

19 | Center.  Mr. Jaramillo has an extensive psychiatric history, including suicide attempts,

20 | psychiatric medications, and involuntary placement in an Idaho state psychiatric hospital.

21 | 10.     Joshua Mills is a pretrial detainee in custody at West Valley Detention

22 | Center.  Mr. Mills has an extensive psychiatric history that includes suicide attempts and

23 | psychiatric medications.

24 | **Defendant**

25 | 11.     Defendant County of San Bernardino operates four jail facilities – West

26 | Valley Detention Center, Central Detention Center, High Desert Detention Center, and the

27 | Glen Helen Rehabilitation Center – that incarcerate approximately 6,000 people.

28 | Defendant also operates several detention facilities that incarcerate people for 96 hours or

1   less.  The County is responsible for ensuring that the basic human needs of individuals in

2   its custody are met, and for ensuring that individuals are not at risk of serious harm,

3   including by providing appropriate funding, oversight, and corrective action to ensure

4   adequate conditions.

5                          **FACTUAL ALLEGATIONS**

6   **I.      SAN BERNARDINO COUNTY FAILS TO PROVIDE ADEQUATE HEALTH CARE.**

7            12.     Defendant subjects all people confined in the jails, including Plaintiffs, to a

8   substantial risk of injury or death by failing to provide adequate medical, mental health,

9   and dental care.  Individuals in the jails are entirely dependent on Defendant for their basic

10  health care needs.  Defendant has a policy and practice of inadequately screening for

11  serious health care conditions and disabilities, delaying access to clinicians and

12  medications, understaffing health care professionals, delaying access to specialty care, and

13  failing to provide the full array of services necessary to meet minimum standards of care.

14  Defendant is deliberately indifferent to the risk of harm caused by these serious health care

15  deficiencies.

16           **A. Mental Health Care Is Inadequate.**

17           13.     Defendant's mental health care delivery system is deficient in staffing,

18  screening, therapeutic treatment, suicide prevention, medication management, timely

19  evaluations, recordkeeping, and confidentiality.

20           14.     There are not enough psychiatrists and therapists to meet the demands of the

21  current jail population.  As a result, Defendant cannot implement the essential components

22  of an adequate mental health delivery system.

23           15.     Upon arrival, untrained correctional officers, and not health care

24  professionals, screen people for health care symptoms, including for mental illness and

25  suicidality.  If the screening correctional officer manages to identify an individual as

26  mentally ill, he or she is referred to mental health staff for an evaluation.  However, this

27  evaluation is often delayed, incomplete, and inadequate.  The focus of the clinical

28  evaluation is centered on any history of psychiatric medications, and the other necessary

3

1  components of an adequate assessment (e.g., current symptoms, substance abuse, social
2  history, and suicide history) are given short-shrift.

3      16.    Defendant does not have a functioning system to ensure timely access to
4  mental health care.  Once housed, the primary method for people to request health care is
5  to give a Health Service Request form ("HSR") to a correctional officer.  This practice
6  deters people from asking for help because custody staff may review their personal
7  information, and many HSRs are lost or destroyed before reaching health care staff.

8      17.    For those individuals who manage to transmit a request for help to mental
9  health staff, the treatment options are extremely limited.  There is no counseling or
10 therapy.  Instead, Defendant provides a brief, non-confidential, cell-front visit by a
11 clinician, flanked by at least one correctional officer, typically several weeks after the
12 individual first requested help, to assess if there are acute mental health symptoms.  There
13 is no effort to explore or treat the underlying mental health condition.  There is no effort to
14 provide people with practical skills to help them cope with their symptoms or living
15 conditions, including being locked in their cells for 23 or more hours a day, as is common
16 practice.  Mr. Turner, for example, has experienced agitation, irritability, and despair as a
17 result of his prolonged placement in solitary confinement at High Desert Detention Center.
18 In February 2016, jail staff documented that Mr. Turner requested mental health
19 counseling services.  The only treatment plan for Mr. Turner was to provide him with a list
20 of outpatient clinics and encourage him to seek mental health treatment upon release.  The
21 brief cell-front visits often do not even address the symptoms described in the HSR that
22 prompted the visit.  For example, even though a transgender woman had turned in at least
23 two HSRs describing gender dysphoria in October 2015, the clinician who evaluated her in
24 November 2015 did not discuss gender dysphoria symptoms with her.

25     18.    Moreover, because these visits occur at cell-front within earshot of other
26 prisoners and custody staff, people are reasonably hesitant to divulge personal information
27 that may result in stigmatization and abuse.  Mr. Mills, for example, has an extensive
28 psychiatric history and experiences serious auditory and visual hallucinations. His only

4

opportunities to interact with mental health clinicians at the jail take place through a locked cell door within earshot of custody officers and other prisoners.   For individuals in administrative segregation, jail clinicians stoop over and speak to patients through the food tray slot in the cell door even when there is no security risk involved in opening the cell door and moving the patient to an appropriate clinical space.

19.   Defendant has a policy and practice of denying or delaying access to psychiatrists.  Therapists generally operate as gatekeepers, and, based on assessments they are not qualified to make, deny access to psychiatrists.  For example, former plaintiff Zachery Shovey, who is no longer in Defendant's custody, had a serious psychiatric condition that led to placement in state psychiatric hospital for nine months. When Mr. Shovey was in Defendant's custody, he was denied access to a psychiatrist for over a year after his arrest, despite serious mental health symptoms, because a therapist decided medications were not warranted since he had not been receiving them in the months before he was arrested.  Individuals who are referred to a psychiatrist must often wait several weeks to be seen.  Once a jail clinician finally referred Mr. Shovey to a psychiatrist because of symptoms including paranoia and mania, he had to wait five weeks and file two grievance before a psychiatrist evaluated him.  People who are suffering from severe symptoms must wait weeks or months before receiving psychiatric medications.

20.   If and when Defendant provides psychiatry services, the treatment is often haphazard and inconsistent.  Many people are denied medications entirely until and unless they either threaten or attempt suicide.  Defendant does not always provide a comprehensive psychiatry evaluation before prescribing or changing powerful psychiatric medications, and fails to adequately monitor people prescribed such medications for side effects, drug interactions, and effectiveness.

21.   Defendant's suicide prevention practices are dangerous and ineffective.  For example, Defendant did not conduct a mental health screening of Mr. Jaramillo for over a week after a Court ordered that he be evaluated by a psychologist for suicidal thoughts.  If and when Defendant identifies an individual at risk of suicide, correctional officers force

the individual to strip naked and lock him or her in a "safety cell," which is nothing more than a small jail cell with rubber coated walls, no furniture, and a hole in the floor to use as a toilet.  The individual is left in this cell for many hours, sometimes days, without any meaningful treatment until Defendant receives some assurance that the individual is no longer suicidal.  However, Defendant then abruptly releases such individuals back to their housing units without close monitoring of their symptoms and a without a timely follow-up appointment with a clinician.  People quickly cycle in and out of safety cells because they remain untreated.

22.     Conditions in the designated mental health units are deplorable. Some days, raw sewage spews from the toilets and floods the cells.  Some people with inadequately treated mental illness smear themselves and the walls of their cell with excrement.  The smell of feces pervades the units.

23.     Many individuals in the designated mental health units are incoherent, unresponsive, or actively delusional.  Some are partially or fully naked in their cells.  Some scream repeatedly in anguish, or are so consumed by auditory or visual hallucinations that they are unable to communicate.  Even for this highly acute population, no individual mental health treatment or counseling is provided. Psychiatric medications are the only form of treatment provided, and many individuals in designated mental health units report great difficulty accessing a psychiatrist when they have concerns about their medications..

**B. Medical Care is Inadequate.**

24.     As described above, Defendant has a policy and practice of failing to adequately complete the most important encounter in a medical care delivery system – the intake screening.   An adequate intake screening is integral because it identifies medications, infectious diseases, and health care conditions that must be addressed to prevent injury and death.  Defendant assigns correctional officers to conduct the majority of the intake screenings.  These correctional officers are not qualified to recognize and respond to the signs and symptoms of serious medical conditions such as substance withdrawal or infectious diseases.  They are not qualified to identify, nor does Defendant

verify, prescribed medications for individuals entering the jail, especially for those who are in extreme distress or under the influence of substances.  Defendant also fails to conduct an intake screening for individuals who are transferred from other facilities to West Valley Detention Center for medical treatment, and instead sends them straight to housing units without any contact with medical staff.  Consequently, many people are later hospitalized for conditions that could have been prevented if appropriately identified and addressed at the intake screening.

25.     Defendant does not conform to the professional standard of care in the prevention and control of infectious diseases.  It fails to adequately screen for tuberculosis, a highly contagious and deadly disease with a high prevalence rate among people in Defendant's custody.  Defendant fails to provide adequate soap and sanitizers to staff and prisoners.  Defendant also does not adequately sanitize shavers and hair clippers that are shared by dozens of individuals.  Defendant's policies and practices create an unreasonable risk of the spread of infectious diseases.

26.     Defendant does not adequately assess, manage, or treat individuals suffering from substance withdrawal complications, and its policies and practices regarding withdrawal do not conform to the professional standards of care.

27.     Defendant does not consistently respond in a timely manner, it if responds at all, to individuals who submit HSRs regarding serious medical conditions.  For example, Mr. Shovey submitted HSRs on February 22 and March 1, 2015, reporting recent seizures and that his seizure meds may need to be adjusted.  Medical staff did not respond to either HSR.  Indeed, Defendant did not evaluate him until April 3, 3015, when custody staff made an emergency call to nursing staff because Mr. Shovey was having a seizure.  Many of these types of emergencies, including those that require hospitalizations, could be avoided if Defendant had a policy and practice of timely responding to HSRs.

28.     Defendant does not have a functioning system to ensure that people receive timely access to specialty care and that specialists' treatment recommendations are provided.  Defendant provides many specialty services on site at the West Valley

7

1  Detention Center, but then fails to arrange transportation to those services for individuals

2  housed at the other jail facilities.  Those individuals wait months or are never rescheduled

3  for the specialty services because Defendant does not have a tracking system to identify

4  missed appointments.  In addition, the jail providers responsible for the overall care of the

5  individuals needing specialty services fail to monitor them once referred, and thus do

6  nothing when a specialty appointment is missed or when a specialist recommends

7  treatment that must be ordered by the jail provider.  Similarly, Defendant does not have an

8  effective system to timely receive diagnostic test results that are necessary for adequate

9  treatment of serious medical conditions.

10  29.  Defendant has a policy and practice of failing to adequately review,

11  document, or correct any deficiencies in care.  For individuals who die in custody,

12  Defendant's practice is to gather records for at least eight to 12 months regarding the

13  death, and then confer with its attorneys.  There are no documented findings or conclusions

14  from the records.  There are no psychological autopsies of suicides.  Defendant does not

15  interview or meet with custody and health care staff who may have been involved in a

16  death.  There is no documented plan for corrective action.  For individuals who do not die

17  in custody, there is no assessment or evaluation of the overall quality of care, identification

18  of problems or shortcomings in the delivery of care, corrective action to overcome these

19  deficiencies, or follow-up monitoring to ensure corrective steps are effective.  Defendant's

20  failure to implement an effective death review and quality assurance program results in a

21  substantial risk of harm of preventable injury and death.

22  **C. Dental Care is Inadequate.**

23  30.  Defendant has a policy and practice of denying the full range of dental

24  services that is necessary to maintain dental health.  It does not, for example, provide root

25  canals, dentures, or dental floss, even for those people who will be incarcerated for several

26  years.  For those patients who require root canals, Defendant offers to extract teeth at no

27  cost or refers the patient to a private dentist who charges the patient for hundreds or

28  thousands of dollars for root canals and other treatment alternatives to save the teeth.  This

practice forces many indigent people to extract teeth that might otherwise be saved.  Many people who do not have access to money in jail refuse extraction and wait in pain and discomfort with the hope that they can pay for the appropriate treatment alternative once released.  Those individuals, who may be incarcerated for long periods of time, are at risk of infection and further complications as a result of Defendant's policies and practices.  Defendant also fails to timely respond to HSRs describing serious dental symptoms.

D. Health Care Records are Inadequate.

31.     Defendant has a policy and practice of failing to maintain accurate, complete, and organized medical, mental health, and dental records.  Defendant uses paper, instead of electronic, records that are not in chronological order or organized in such a way that providers can find essential information about their patients.  Some of the providers' handwriting is illegible, and many psychiatry records are unintelligible.  Defendant loses, misfiles, or inappropriately destroys essential records, including HSRs.  The records are not always available during health care appointments, especially when individuals are transferred to different jail facilities.  As a result of Defendant's failure to maintain adequate records, individuals suffer from a substantial risk of misdiagnosis, dangerous mistakes, and unnecessary delays in care.

32.     Defendant also has a policy and practice of denying people copies of their own jail health care records in violation of 45 C.F.R. § 164.524.

II.     SAN BERNARDINO COUNTY HAS A POLICY AND PRACTICE OF USING EXCESSIVE FORCE

33.     Defendant has a policy and practice of using excessive force in the jails that subjects people to serious injury or the risk of serious injury.  Correctional officers tase, fire non-lethal weapons at close range, punch, push, stomp, slam, or restrain individuals when it is not necessary  to ensure safety and security.  These assaults result in broken bones, dislocated joints, swelling, bruising, and hemorrhaging.

34.     Defendant has a pattern of using force as a first resort in reaction to any behavior that might possibly be interpreted as aggressive.  Force is used on people who are

deemed, correctly or not, to have disrupted jail operations, disobeyed jail rules, complained about conditions, or disrespected jail staff. In many instances, the use of force is completely unnecessary to control behavior or maintain order in the jails. In some instances, the use of force may be necessary *initially*, but after the need for force has passed, the individual is subjected to retaliatory assault.

35. These patterns of excessive force occur because Defendant does not adequately train, supervise, and discipline correctional officers. These patterns also occur because Defendant's written policies and procedures are inadequate. For example, Defendant's policies do not require that officers first attempt to verbally resolve or use only the minimum force necessary to stop or control a potentially dangerous interaction. Officers are not required to document every use of force incident, and not all use of force incidents are reviewed by supervisory staff. Defendant's policies do not include any limitations on the use of force against people who are unable to comply with commands due to severe mental illness, or the use of restraints on people who are vulnerable to injuries, including pregnant women. There is no system for people in custody to confidentially report excessive use of force.

36. All people in the jail, including Plaintiffs, are at risk of harm due to Defendant's policies and practices regarding the use of force.

**III.    SAN BERNARDINO FAILS TO PROTECT PEOPLE FROM VIOLENCE**

37. People in Defendant's custody face a substantial risk of harm from violence at the hands of other incarcerated people due to its policy and practice of failing to adequately supervise and classify people in its custody. Vulnerable individuals are regularly assaulted and victimized by other individuals in the facilities or during transportation because Defendant has failed to take reasonable measures to protect them. Defendant is deliberately indifferent to the danger of assault faced by people in its custody.

38. Given the structural design of the housing units, there are not enough correctional officers assigned to each unit to adequately supervise people. In West Valley Detention Center, officers are stationed in an enclosed control booth that overlooks several

separate housing pods.  Officers cannot see all areas of the housing pods from the control booth, and there are substantial periods of time when there are no officers in the pods.  As a result, people are often assaulted in the housing units when officers are not looking or present.   In February 2015, former plaintiff George Topete, who is no longer in Defendant's custody, was assaulted during a riot in his housing unit when there were no officers present.  Defendant knew the riot was going to happen because an individual wrote a note to correctional officers about the planned riot, but nothing was done to prevent it.  During the riot, Mr. Topete tried to avoid the fighting by standing next to the door where the officers would enter.  While he stood there, he was punched in the face, hit with a milk crate, and hit with a plastic bedframe before he finally used his cane to keep attackers away from him.  Correctional officers did not enter the housing pod until several minutes later.

39.    Defendant does not adequately classify and assign people to housing locations where they will be safe from injury and violence.   Individuals who are incompatible are regularly housed together.  For example, in September 2015, a gang member was stabbed repeatedly in his cell by a rival gang member.  Defendant moved the victim to another housing unit for a few days, but then moved him back to the same housing unit where he was again stabbed repeatedly.  Defendant knew that one or both of these assaults was going to occur because correctional officers intercepted a note discussing the planned attack.  In other instances, people who notify staff that they are gang "drop-outs" are housed with the general population, instead of in protective custody, where they are attacked by active gang members.  People who are obviously psychotic and unstable are also housed with the general population where they assault or are assaulted by other individuals.   In July 2016, while housed in the Unusual Behavior unit, Ms. Lewis was punched in the face by her cellmate while she was sleeping.  Ms. Lewis lost consciousness, sustained swelling to her cheek and nose, and was sent to the emergency room.

40.    Even when Defendant properly classifies people, they face an unreasonable

11

risk of violence when they leave their housing units.   Individuals with different classifications are placed together in holding cells when they wait for court hearings or other appointments and in vehicles when they are transported to other locations such as the courthouse, hospital, or other jail facilities.   What is more, individuals with different classifications are chained together in these holding cells and vehicle transports.   A significant percentage of assaults occur outside of the housing units.

41.    When individuals notify staff members that they are at risk of assault, Defendant fails to adequately respond and ameliorate the risk.  Correctional officers laugh at or ignore them, tell them that they have no choice but to "get along," or in some instances even encourage them to fight when they notify them of a risk of violence. Correctional officers do not arrive on the scene of an attack until it is completed, if they are ever aware of an attack at all.

42.    As a result of these policies and practices, there is a high rate of violence, and people are suffering from serious injuries.  In fact, most people who are assaulted require medical attention, oftentimes at an off-site emergency room.  Defendant has failed to take reasonable measures to mitigate this harm, and, as a result, a culture of violence between incarcerated individuals flourishes.

## IV.    DEFENDANT DISCRIMINATES AGAINST PEOPLE WITH DISABILITIES

43.     Defendant has a policy and practice of failing to ensure that people with disabilities have equal access to programs, services, and activities in the jails.

44.    At the time of intake, Defendant does not appropriately identify individuals' disabilities and needed assistive devices.  Defendant routinely fails to collect critical information about individuals' physical disabilities at the time of intake, including whether the individual requires a cane, wheelchair, walker, or accessible housing.

45.    Defendant does not timely provide appropriate assistive devices, including but not limited to wheelchairs, walkers, crutches, canes, braces, and hearing aids, to people who require them, if they ever provide them at all.  For example, a jail physician ordered a four-wheeled walker for a woman with a mobility impairment in March 2015.  She did not

1   receive the walker until over three months later, and then only after Plaintiffs' counsel
2   repeatedly asked Defendant to provide it.

3       46.   After intake, Defendant does not house people with physical disabilities in
4   locations where they can safely programs and services.  For example, Defendant did not
5   house Mr. Topete, who uses a wheelchair, in an accessible housing unit.  His wheelchair
6   did not fit through his cell door, which meant that he had to stand up, fold his wheelchair,
7   push it through the doorframe, and then unfold the wheelchair again once inside.  There
8   were no grab bars next to the toilet inside his cell or the shower.  Defendant forced him to
9   go up and down stairs, without any assistance, to access the visiting room to visit his
10  family.  Once he reached the top of these stairs, Defendant did not provide him with his
11  wheelchair that remained on the floor below.  Mr. Topete fell and was at risk of serious
12  injury as a result of Defendant's failure to accommodate him.  Defendant does not have
13  enough housing units equipped with accessible features to meet the needs of its current jail
14  population.

15      47.   Defendant does not provide timely or adequate access to medical supplies or
16  equipment for people with physical disabilities.  People who require colostomy supplies
17  are at risk of infections because Defendant does not consistently deliver the appropriate
18  supplies.  Mr. Topete, in addition to a wheelchair, required the use of a C-PAP machine to
19  sleep at night.  Defendant housed him in a cell that did not have an electrical outlet, and
20  required him to sleep in the dayroom if he wanted to plug in his C-PAP machine.
21  Defendant also required Mr. Topete to drag a plastic bedframe and mattress to and from
22  storage, without assistance, many evenings and the following mornings.  Once Mr. Topete
23  managed to get his bed into the dayroom, he had difficulty getting in and out of the bed
24  because the frame sat directly on the ground and it was difficult for him to bend and stoop.
25  At least a few times a month, Mr. Topete woke up choking and gasping for air because
26  correctional officers had turned off the power in the dayroom and he could not breathe
27  through his C-PAP machine without electricity.

28      48.   Defendant does not have an effective complaint procedure for people to

contest disability discrimination.  The only mechanism Defendant provides to raise disability issues is the jail grievance form.  However, individuals must ask correctional officers for grievance forms who often refuse to provide them.  Defendant requires correctional officers to review and sign any grievances before they are processed, but many officers attempt to dissuade prisoners from filing them, threaten retaliation for use of the grievance process, or refuse to sign or process the forms.  Moreover, many people with disabilities are unaware of Defendant's obligation to ensure equal access to programs, services, and activities because Defendant has failed to provide notice of their disability related rights as required by federal law.

49.     Defendant's policies and procedures regarding screening, housing, assistive devices and medical supplies, grievances, and the use of solitary confinement for people with disabilities is a direct violation of the ADA and Section 504 of the Rehabilitation Act.

## V.     DEFENDANT SUBJECTS PEOPLE TO HARMFUL, INHUMANE CONDITIONS OF SOLITARY CONFINEMENT

50.     Defendant, by policy and practice, locks hundreds of people in small cells for at least 23 hours a day for months or years at time. Over the last several decades, mental health and correctional experts have documented the harmful effects of prolonged solitary confinement. Prolonged solitary confinement is defined as any period of time over three to four weeks.[1] Common side effects of prolonged solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors. *Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (citing Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006)). Defendant is deliberately indifferent to the substantial and obvious risk of harm caused by its policy and practice of locking people in solitary confinement for prolonged periods of

---

[1] American Psychiatric Association, Position statement on segregation of people with mental illness (2012), available from http://www.psychiatry.org/File%20Library/Learn/Archives/.

time.

51.   Defendant locks people in solitary confinement in various areas of the jails, including lockdown units and mental health units, for 23 hours or more per day.

52.   Many prisoners in the jails report that most days they get of their locked cells no more than 30 minutes.  Their opportunity to use the dayroom may take place at 1 am or 2 am.

53.   In some housing units, that scant dayroom time is the only chance people have to shower, watch TV, or socialize with others.

54.   Prisoners in some housing units report that they are only permitted to go to outdoor yard once a week, and that this opportunity is provided only in the early hours of the morning.

55.   Due to frequent lockdowns, people in the jails may go several days without ever leaving their cells.

56.   People in solitary confinement eat all of their meals inside their cells, usually sitting on their beds.

57.   Defendant restricts their property such that many people in these housing units spend hours in their locked cells without external stimulation.

58.   Defendant prohibits them from attending any structured group recreational, religious, educational, or vocational programs.

59.   Defendant shackles people in these units every time they have contact with officers outside of their cells.

60.   Most people are locked in single-occupancy cells and cannot have normal human conversations with other individuals. Their only avenues of communication are to speak through the vents in their cells, or to yell loudly enough for people to hear through the cell walls and doors. Any communication with another suspected gang member, even just a greeting, may be and has been used by Defendant to justify retention in solitary confinement.

61.   Some people are double-celled, but being locked up with a cellmate in a fifty

15

square foot cell does not compensate for the severe isolation in solitary confinement. Instead, double-celling requires two strangers to live around-the-clock in intolerably cramped conditions, in a cell barely large enough for a single human being to stand or sit.

62. Defendant subjects some people in its jails to extreme forms of segregation. At West Valley Detention Center, some of the cells are located outside of the main housing unit. These cells are separated by a hallway and a closed door, such that individuals cannot hear or see activity in the housing unit. Officers have no line of sight into these cells, and people locked in the cells experience serious sensory deprivation.

63. Despite the harmful and punitive conditions in these units, Defendant lacks an effective, accurate classification system to determine who gets placed in solitary confinement. In some cases, people may spend months in solitary confinement purely on the basis of their pending criminal charges – even if those charges do not involve violence. As a result, many people are separated from the general population and subjected to the harms of solitary confinement even though they pose no risk to safety or security of others.

64. Prolonged solitary confinement can be harmful for anyone, but it is particularly traumatic for people with psychiatric and/or intellectual disabilities. Defendant has not modified its policies and procedures to accommodate people with such disabilities so that they do not suffer harm from solitary confinement. Defendant locks people with psychiatric and/or intellectual disabilities in solitary confinement for nonconforming and erratic behaviors related to their conditions, some of which could have been avoided if Defendant provided adequate mental health care or accommodations. The harsh conditions and the lack of mental health care or accommodations in lockdown units cause them to continue and escalate these symptomatic behaviors. In response, Defendant locks them in solitary confinement for longer periods of time.

65. Defendant's policy and practice of locking people with psychiatric and/or intellectual disabilities in solitary confinement, based on their disabilities, inappropriately deprives them of access to programs, services, and activities that are only available in less restrictive settings.

66.   Defendant does not exclude people with mental illness  being housed in solitary confinement. Defendant also fails to monitor people with and without psychiatric disabilities or provide sufficient mental health services once they are locked in solitary confinement despite the well-known medical and mental health risks inherent in locking people in their cells for prolonged periods of time.

**VI.   CLASS ALLEGATIONS**

67.   Plaintiffs Rahshun Turner, Monique Lewis, Jaime Jaramillo, and Joshua Mills bring this action on their own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all people who are or will in the future be incarcerated in the San Bernardino County Jail.

68.   All  class members are at risk of harm due to the following policies and practices:

(a) Using force that subjects people to serious injury or the risk of serious injury even when it is unnecessary to control behavior or maintain order in the jails;

(b)   Denying minimally adequate health care including identification and monitoring of serious conditions, sufficient staffing levels, timely access to appropriate clinicians, medications, and treatment plans, effective suicide prevention practices, and the complete range of health care services necessary to maintain health;

(c)   Failing to adequately supervise and classify individuals to ensure that they do not face an unreasonable risk of injury and violence from other incarcerated individuals.

People with disabilities also face the additional risk of disability discrimination due to Defendant's inadequate policies and practices regarding solitary confinement, assistive devices and medical supplies, accessible housing, and grievances.

69.   There are questions of law and fact common to the class including whether Defendant by its policy and practice of (1) denying minimally adequate mental health, medical, and dental care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (2) using

17

excessive force violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (3) denying adequate supervision and classification to protect people from violence violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment; (4) denying assistive devices, medical supplies, and accessible housing to people with physical disabilities violates the ADA and Section 504 of the Rehabilitation Act; and (4) locking people with psychiatric disabilities and/or intellectual disabilities in solitary confinement based on their disabilities violates the ADA and Section 504 of the Rehabilitation Act.

70.     Since there are thousands of class members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for Defendant.

71.     Defendant has acted and failed to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

72.     Plaintiffs' claims are typical of the claims of the class, since his claims arise from the same policies, practices, and courses of conduct and his claims are based on the same theories of law as the class's claims.

73.     The named Plaintiffs, through counsel, will fairly and adequately protect the interests of the class.  Plaintiffs do not have any interests antagonistic to the plaintiff class. Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendant.  Further, Plaintiffs are represented by counsel experienced in prisoners' rights litigation and complex class action litigation.

## CLAIMS FOR RELIEF

### First Cause of Action
### (Fourteenth Amendment - Cruel and Unusual Conditions, 42 U.S.C. § 1983)

74.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

75.     By the policies and practices described herein, Defendant subjects Plaintiffs and the class to a substantial risk of serious harm and injury from inadequate health care, violence between prisoners, and excessive force, and has violated their right to basic human dignity and to be free from cruel and unusual conditions under the Fourteenth Amendment to the United States Constitution.  These policies and practices have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause of the Plaintiffs' and the class's ongoing deprivation of rights secured under the Fourteenth Amendment.

76.     Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.  It should be obvious to Defendant and to any reasonable person that the conditions imposed on class members for many months or years cause tremendous mental anguish, suffering, and pain to such individuals.  Moreover, Defendant has repeatedly been made aware, through administrative grievances and written complaints, that class members are currently experiencing, or are at risk of, significant and lasting injury.

**Second Cause of Action**
**(Eighth Amendment – Cruel and Unusual Punishment, 42 U.S.C. § 1983)**

77.     Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 - 54 as if set forth fully herein.

78.     By the policies and practices described herein, Defendant subjects Plaintiffs and the class to a substantial risk of serious harm and injury from inadequate health care, violence between prisoners, and excessive force, and has violated their right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.  These policies and practices have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause of the Plaintiffs' and the class's ongoing deprivation of rights secured under the Eighth Amendment.

79.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.  It should be obvious to Defendant and to any reasonable person that the conditions imposed on class members for many months or years cause tremendous mental anguish, suffering, and pain to such individuals.   Moreover, Defendant has repeatedly been made aware, through administrative grievances and written complaints, that class members are currently experiencing, or are at risk of, significant and lasting injury.

### Third Cause of Action
### (Americans with Disabilities Act)

80.   Plaintiffs incorporates by reference each and every allegation contained in Paragraphs 1 - 54 as if set forth fully herein.

81.   Plaintiffs Lewis, Jaramillo, Mills, and Turner and other class members with physical, psychiatric, or intellectual disabilities are qualified individuals with disabilities as defined in the ADA.  They have an impairment that substantially limits one or more major life activities, they have a record of such impairment, or they are regarded as having such an impairment.   All people with disabilities in the jails meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant.  42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

82.   Defendant is a public entity as defined under 42 U.S.C. § 12131(1)(A).

83.   Defendant violates the ADA by failing to ensure that people with disabilities have access to, are permitted to participate in, and are not denied the benefits of, programs, services, and activities.  42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

84.   Defendant violates the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ."  28 C.F.R. Section 35.130(b)(7).

85.   Defendant violates the ADA by failing to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals."  28 C.F.R. § 35.152(b)(2).

86.     Defendant violates the ADA by failing to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities an equal opportunity to participate in … a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

87.     Defendant violates the ADA by failing to notify people about their rights under the ADA while detained in its jails.  28 C.F.R. § 35.106.

88.     Defendant violates the ADA by failing to "adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by … [the ADA]."  28 C.F.R. § 35.107(b).

89.     As a result of Defendant's policies and practices regarding people with disabilities in its jails, Plaintiffs Turner, Lewis, Jaramillo, and Mills and other class members with disabilities do not have equal access to jail activities, programs, and services for which they are otherwise qualified.

**Fourth Cause of Action**
**(Section 504 of the Rehabilitation Act)**

90.     Plaintiffs incorporates by reference each and every allegation contained in Paragraphs 1 - 54 as if set forth fully herein.

91.     Plaintiffs Turner, Lewis, Jaramillo, and Mills and other class members with disabilities are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

92.     Defendant receives federal funding within the meaning of the Rehabilitation Act.

93.     Defendant violates Section 504 of the Rehabilitation Act by discriminating against people with disabilities solely on the basis of their disabilities.  29 U.S.C. § 794.

94.     Defendant violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate people with disabilities in its facilities, programs, activities, and services.

95.     Defendant's policy and practice of discriminating against people with

psychiatric and/or intellectual disabilities in the use of solitary confinement is not reasonably related to legitimate penological interests because (1) it worsens their psychiatric conditions; (2) there are no alternative means for them to access programs, services, and activities; (3) there are alternative means to safely and cost-effectively house them in the jails; and (4) it is an exaggerated response as they do not require restrictive housing on the basis of their disabilities.

**PRAYER FOR RELIEF**

96.    Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendant as alleged herein, unless Plaintiffs are granted the relief they request.  The need for relief is critical because the rights at issue are paramount under the Constitution of the United States, the ADA, and Section 504 of the Rehabilitation Act.

97.    WHEREFORE, Plaintiffs on behalf of themselves and the class they represents, requests that this Court grant them the following relief:

A. Declare the suit is maintainable as a class action pursuant to Federal Rule of Civil procedure 23(a) and 23(b)(1) and (2);

B. Adjudge and declare that the conditions, acts, omissions, policies, and practices of Defendant and its agents, officials, and employees are in violation of the rights of Plaintiffs and the class they represent under the Fourteenth and Eighth Amendments to the U.S. Constitution, the ADA, and Section 504 of the Rehabilitation Act;

C. Enjoin Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

D. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide minimally adequate mental health, medical, and dental care, including but not limited to sufficient intake screening, sufficient staffing, timely access to appropriate clinicians, timely prescription and distribution of

22

appropriate medications and supplies, timely access to specialty care, and timely access to competent therapy, inpatient treatment, and suicide prevention;

F. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the excessive use of force.  Defendant's plan at a minimum must address deficiencies in use of force policies and procedures, training, supervision, investigations, and disciplinary practices;

G.  Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to develop and implement, as soon as practical, a plan to reduce the risk of injury and violence between individuals in its custody.  Defendant's plan at a minimum must address deficiencies in classification policies and procedures, staffing levels, and policies and practices related to the transportation of people in its custody;

H. Order Defendant, its agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide equal access to programs, services, and activities for people with disabilities, including but not limited to housing people with physical disabilities in accessible housing appropriate to their needs, timely delivery of and appropriate access to assistive devices and medical supplies, housing people with psychiatric and/or intellectual disabilities in the least restrictive and most integrated settings appropriate to their needs, providing an effective grievance system to contest disability discrimination, and notifying people with disabilities their rights under the ADA and Section 504 of the Rehabilitation Act.;

I. Award Plaintiffs, pursuant to 29 U.S.C. § 794, 42 U.S.C. §§ 1988, 12205, and 12133, the costs of this suit and reasonable attorneys' fees and litigation expenses;

J. Retain jurisdiction of this case until Defendant has fully complied with the orders of this Court, and there is a reasonable assurance that Defendant will continue to comply in the future absent continuing jurisdiction; and

1      K. Award such other and further relief as the Court deems just and proper.

2

3      Dated:  November 10, 2016              PRISON LAW OFFICE

4                                            By: /s/ Margot Mendelson
5                                            DONALD SPECTER
                                             MARGOT MENDELSON
6                                            1917 Fifth Street
7                                            Berkeley, California 94710
                                             Telephone: (510) 280-2621
8                                            Fax: (510) 280-2704
                                             *Attorneys for Plaintiffs*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**