# EXHIBIT 1

DONALD SPECTER (83925)
dspecter@prisonlaw.com
MARGOT MENDELSON (268583)
mmendelson@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

*Attorneys for Plaintiffs*
*On behalf of themselves and others similarly situated*

MARTIN H. DODD (104363)
mdodd@fddcm.com
JAMIE L. DUPREE (158105)
jdupree@fddcm.com
JAIME G. TOUCHSTONE (233187)
jtouchstone@fddcm.com
FUTTERMAN DUPREE DODD CROLEY MAIER LLP
601 Montgomery St., Suite 333
San Francisco, California 94111
Telephone: (415) 399-3840
Facsimile: (415) 399-3838

In Association with:
MILES KOWALSKI, Deputy County Counsel (257269)
Miles.Kowalski@cc.sbcounty.gov
MICHELLE BLAKEMORE, County Counsel (110474)
385 North Arrowhead Avenue, 4th Fl.
San Bernardino, CA 92415-0140
Telephone: (909) 387-5455
Facsimile: (909) 387-3070

*Attorneys for Defendant San Bernardino County*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION - RIVERSIDE**

RAHSHUN TURNER, on behalf of themselves and all others similarly situated,

*Plaintiffs,*

v.

COUNTY OF SAN BERNARDINO,

*Defendant.*

Case No. 5:16-CV-00355-VAP (DTBx)

**[PROPOSED] CONSENT DECREE**

**District Court Judge Virginia A. Phillips**
**Magistrate Judge David T. Bristow**

## A. Introduction

1. The parties to this Consent Decree are Plaintiffs Rahshun Turner, Monique Lewis, Jaime Jaramillo, Joshua Mills and the class and subclasses of inmates they represent (collectively, "Plaintiffs"), on the one hand, and Defendant

County of San Bernardino ("Defendant"), on the other hand. The parties enter into this Consent Decree to ensure the provision of constitutional medical, dental and mental health care, to ensure non-discrimination for inmates with disabilities and to address uses of force and restrictive housing in the San Bernardino County Jails.[1]

2. Plaintiffs filed this Action on February 29, 2016 and filed a Second Amended Complaint on November 18, 2016. The Action alleges that Defendant fails to provide minimally adequate medical, dental and mental health care to the people incarcerated in its jails, fails to prevent unnecessary and excessive uses of force against inmates and imposes on inmates the harmful and excessive use of solitary confinement in violation of the Eighth and Fourteenth Amendments to the United Constitution, as well as discrimination against certain inmates with disabilities in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Defendant has denied liability. On January 27, 2017, the Court granted the parties' joint motion for class certification.

3. The Plaintiff class consists of "all people who are now, or in the future will be, incarcerated in the San Bernardino County jails" and a subclass of "all people who are now, or in the future will be, incarcerated in the San Bernardino County jails and who have a psychiatric and/or intellectual disability, as defined under the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. §794."

///

[1] For the purposes of this Consent Decree, references to the San Bernardino Jails include the Type I and II jails as well as the Arrowhead Regional Medical Center, to the extent it houses inmates under the jurisdiction of the San Bernardino County Sheriff, and any new structures designated to house prisoners under the jurisdiction of the San Bernardino County Sheriff subsequent to the date of this Consent Decree. The parties acknowledge that, because Type I jails are very short-term holding facilities, certain provisions of Remedial Plan attached hereto as Exhibit A will apply only to Type II jails at which inmates are housed for longer periods of time.

4. Commencing in January 2015, prior to the initiation of this Action, the parties undertook settlement negotiations to address Plaintiffs' claims and those negotiations have continued. To aid in settlement negotiations, the parties agreed to hire neutral experts to investigate and opine on the adequacy of medical and mental health care delivered in the San Bernardino jails, as well as the extent and propriety of uses of force against inmates incarcerated by Defendant. The parties jointly selected Todd Wilcox, M.D., as the expert on medical care; Roberta Stellman, M.D., as the expert on mental health care; and Jeffrey Schwartz, Ph.D., and Gary Raney, former Sheriff of Boise County, Idaho, as experts with regard to use of force in the jails.

5. The experts conducted extensive tours and reviews of the jail facilities, policies and procedures and interviewed staff and inmates. They drafted preliminary reports setting forth their findings and recommendations, and both parties were given the opportunity to review the reports and make comments. The experts thereafter submitted their final reports setting forth their respective findings and making recommendations for remedial action.

6. With respect to dental care in the jails, alleged discrimination against inmates with disabilities and policies governing restrictive housing in the jails, the parties engaged in direct discussions without benefit or need of joint experts or expert reports or findings.

7. The parties thereafter negotiated individual remedial plans pertaining to the matters alleged in the Action and those individual plans have been incorporated into a single, global Remedial Plan, attached hereto as Exhibit A.

8. Each party to this Consent Decree was represented by counsel during its negotiation and execution. Plaintiffs and the Plaintiff classes and subclasses are represented by Donald Specter, Margot Mendelson and Sara Norman, Prison Law Office. Defendant is represented by Martin H. Dodd, Futterman Dupree Dodd Croley Maier, LLP, and Miles Kowalski, Deputy County Counsel for the County

of San Bernardino.

9. Through this Consent Decree, Defendant agrees to implement the measures set forth in the Remedial Plan, subject to monitoring by the Court experts and Plaintiffs' counsel, negotiation between the parties, and if necessary, enforcement by the Court.

**B. Remedial Plan**

10. Defendant shall fully implement all of the remedial measures, according to the specified timeframes, set forth in the Remedial Plan. The Remedial Plan is designed to meet the minimum level of health care necessary to fulfill Defendant's obligations under the Eighth and Fourteenth Amendments, to ensure that unlawful force is not utilized in the jails, to avoid the unlawful use of segregated or restrictive housing in the jails and to ensure compliance with the ADA and Section 504 of the Rehabilitation Act.

11. Defendant shall, in consultation and collaboration with Plaintiffs' counsel, develop and implement appropriate and adequate plans, policies, and practices to ensure compliance with the Remedial Plan. At least 30 days prior to finalizing or implementing any new plans or policies developed to meet the terms of the Remedial Plan, Defendant will submit such plans or policies to Plaintiffs' counsel for their review and comments. Disagreements about the adequacy of such plans or policies shall be resolved pursuant to the dispute resolution procedure set forth paragraphs 28-31, below.

12. Not less than 90 days, and not more than 120 days, after this Consent Decree is approved by the Court, Defendant shall provide to Plaintiffs' counsel and the Court experts a Status Report stating whether it is complying with the terms of this Consent Decree. The Status Report shall include a description of the steps that Defendant has taken to implement the Remedial Plan. Not later than the end of each subsequent 120-day period during the term of this Consent Decree, Defendant shall provide to Plaintiffs' counsel and the Court experts a Status

Report addressing each item of the Remedial Plan and shall specify whether it believes it is or is not in substantial compliance with each material component of the Remedial Plan.[2]

**C. Court Experts**

13. Pursuant to Rule 706 of the Federal Rules of Evidence, the parties jointly request the appointment of Todd Wilcox, M.D., Roberta Stellman, M.D., and Jeffrey Schwartz, Ph.D. and Gary Raney, as Court experts to advise the Court on the County's compliance or non-compliance with the medical care, mental health care and use of force provisions, respectively, of the Remedial Plan, to assist with dispute resolution matters addressed in paragraphs 28-31, and to provide testimony, if required, in any proceedings before the Court.

14. Within 180 days after entry of this Consent Decree, and then every 180 days thereafter during the term of this Consent Decree, the Court experts shall each complete comprehensive reviews and reports ("180-Day Reports") to advise the parties and the Court on Defendant's compliance or non-compliance with the Remedial Plan.

15. In each 180-Day Report the experts shall state their opinion as to whether Defendant is or is not in substantial compliance with each material component of the Remedial Plan within the expert's area of expertise. These opinions are hereinafter referred to as "Substantial Compliance Determinations." The 180-Day Reports shall be considered separate and apart from any evaluations and reports prepared as part of the dispute resolution process described below and shall be admissible in evidence in any proceedings before the Court.

16. The experts' duties specified in Exhibit B shall be provided to the experts pursuant to Rule 706(b). The Court experts shall be entitled to reasonable compensation in an amount approved by the Court, which shall be paid by

[2] For purposes of this Consent Decree a "material component" of the Remedial Plan shall be any of the subparts of the Remedial Plan identified by a capital letter (e.g., "**D. Medical Records**").

Defendant.

17. With appropriate notice, the Court experts shall have reasonable access to all parts of any San Bernardino Jail and access to the facilities will not be unreasonably restricted. The experts shall have access to correctional and health care staff and inmates, including confidential and voluntary interviews as they deem appropriate. The experts shall also have access to documents, including budgetary, custody, and health care documents, and institutional meetings, proceedings, and programs to the extent the experts determine such access is needed to fulfill their obligations. The experts' tours shall be undertaken in a manner that does not unreasonably interfere with jail operations as reasonably determined by jail administrators.

18. The parties agree that they are each entitled to engage in ex parte communications with the Court experts. However, all of the experts' findings and recommendations shall be set forth in writing in their reports.

19. If, for any reason, a designated Court expert can no longer serve or the parties wish to engage any additional expert(s), the parties shall attempt to agree on who shall be appointed to serve as a new or additional expert. If the parties are unable to agree, Defendant and Plaintiffs shall each nominate and submit two potential experts for the Court's consideration and selection.

**D. Notice to Class Members**

20. Defendant shall post notices to class members of this Action in a manner agreed upon by the parties. Such notices shall include a brief statement that includes a description of Plaintiffs' claims, the definition of the classes and subclasses, notice that the parties have entered into this Consent Decree, a description of the subject areas covered by the Consent Decree and Remedial Plan, and the contact information for the Prison Law Office to allow inmates to contact Plaintiffs' counsel.

///

**E. <u>Plaintiffs' Monitoring and Access to Information</u>**

21. Plaintiffs shall be permitted to monitor Defendant's compliance with the Remedial Plan. Defendant shall provide Plaintiffs with access to all such San Bernardino Jail facilities, documents, records, and staff that Plaintiffs believe in good faith is necessary to monitor Defendant's compliance with the Remedial Plan subject, where applicable, to the protective order agreed upon by the parties, entered by the Court on October 18, 2016, and attached hereto as Exhibit C. Plaintiffs shall not be entitled to personnel records, including records and information deemed confidential pursuant to California Penal Code § 832.7. From and after the date this Consent Decree is entered by the Court, Defendant shall provide Plaintiffs with access to such information within 21 calendar days of their request. If Defendant believes that the information requested by Plaintiffs is not necessary to monitor compliance with the Remedial Plan, the parties shall engage in the dispute resolution process described in paragraphs 28-31, below, before seeking any relief from the Court.

22. In each of the first two years following the date on which this Consent Decree is entered, Plaintiffs and their consultants shall be permitted the opportunity to conduct three tours of the San Bernardino Jails for the purpose of monitoring compliance with the Remedial Plan. Thereafter, Plaintiffs shall have the opportunity to conduct up to two tours of the jails per year, <u>provided however</u>, that Plaintiffs may bring a motion seeking authorization from the Court to conduct a third monitoring tour in any given year. Before bringing such a motion, Plaintiffs shall have complied with the dispute resolution process described in Paragraphs 28-31, below. Unless otherwise agreed by the parties or ordered by the Court, monitoring tours by Plaintiffs and/or their consultants shall be separated by a period of no less than 90 days.

23. Monitoring tours shall include reasonable access to all of the jail facilities, including all housing units, facilities where health care services are

provided, facilities where inmates with disabilities are or may be housed and provided programming, and any other facilities where services are provided pursuant to the Remedial Plan. During the tours, Defendant shall make available for interview any supervisory, clinical, custodial, and program staff that have direct or supervisory responsibility for health care and disability accommodations. Defendant shall provide a Sheriff's Department contact person to ensure cooperation of institution staff with Plaintiffs in obtaining information they request during the tours. During the tours, Defendant shall permit and facilitate Plaintiffs having confidential and voluntary discussions with any inmate identified by Plaintiffs. Upon request by Plaintiffs and pursuant to the protective order entered in this case, Defendant shall make available for inspection and/or copying the health care and/or custody files of specified inmates. Disputes that may arise over Plaintiffs' access to jail information or personnel shall be addressed in the first instance by the dispute resolution process set forth in Paragraphs 28-31, below, before the parties may seek relief from the Court.

24. If Plaintiffs form the good faith belief that Defendant is not substantially compliant with any material component of the Remedial Plan then subject to monitoring, Plaintiffs shall so inform Defendant and any relevant Court expert of the alleged noncompliance and identify the material component of the Remedial Plan alleged to be noncompliant.

Defendant shall investigate the alleged noncompliance and provide Plaintiffs with a response in writing within 30 calendar days, provided however, that if the notice from Plaintiffs is provided to Defendant (i) less than 45 days before the next anticipated Status Report, then Defendant may elect to include its response in the next Status Report; or (ii) less than 45 days before the next anticipated 180-Day Report from a relevant Court expert, Defendant may elect to defer responding until the expert has made a Substantial Compliance Determination applicable to the material component of the Remedial Plan alleged

to be noncompliant.

25. Plaintiffs' counsel retain the ability to interview their clients pursuant to regular attorney-client visiting procedures established by the Sheriff's Department. The parties will attempt to establish an efficient means to allow Plaintiffs' counsel to interview clients and conduct confidential telephonic interviews with individual inmates, with reasonable notice, in a manner that does not disrupt jail operations.

26. Plaintiffs' counsel shall be allowed to send postage pre-paid envelopes to their clients in the San Bernardino Jails.

**F. Individual Advocacy**

27. Plaintiffs may bring individual inmates' health care, use of force, restricted housing or disability accommodation concerns to the attention of Defendant's counsel, or their designee, who shall respond in writing within 14 days. This process is not meant to replace or circumvent the existing processes for requesting medical or mental health services or submitting grievances to jail authorities. Inmates will be encouraged to make use of those processes except where exigent circumstances or failures of those processes have occurred.

**G. Dispute Resolution**

28. Either party may initiate the dispute resolution process with respect to a matter covered by this Consent Decree by providing written notice of a dispute ("Dispute Notice") to the other party and to mediator Debra Mellinkoff or such other mediator as the parties may have selected ("Mediator"). The Dispute Notice shall request that the Mediator schedule a date for mediation that is not less than 90, and not more than 120, days after the Dispute Notice.

29. Following service of the Dispute Notice, the parties shall undertake good faith negotiations at such times and places as they deem sufficient in an effort to resolve the dispute informally between them. If, within 30 days after service of the Dispute Notice, the parties have failed to resolve the dispute, either

party may request that the relevant Court expert evaluate the issue in dispute and prepare a report. The expert must provide the report regarding the area of disagreement to the parties and the Mediator within 45 days of the request. Defendant will pay the experts' reasonable fees for any reports prepared by a Court expert at the request of a party about a disputed issue, as contemplated by this paragraph.

30. If the parties are unable to resolve the dispute informally, they shall attempt to resolve the dispute through the scheduled mediation before the Mediator. The parties and the Mediator shall conduct the mediation at such place and in such manner as they shall have agreed upon.

31. Mediation shall be deemed to have concluded with respect to an issue in dispute if i) the parties agree in writing that mediation is concluded; or ii) upon the request of a party, the Mediator determines and so notifies the parties in writing that the parties are at impasse, a party is not negotiating in good faith or further negotiation would be futile.

32. With the exception of any report prepared by a Court expert, as contemplated by Paragraph 29, above, and any notice that mediation is concluded, nothing said and no document prepared in connection with the mediation shall be offered in evidence in any subsequent judicial proceeding in this case.

## H. Enforcement

33. The Court shall retain jurisdiction to enforce the terms of this Consent Decree and shall have the power to enforce the agreement through specific performance and all other remedies permitted by law until Defendant fulfills its obligations under this Consent Decree.

## I. Duration and Termination

34. This Consent Decree shall remain in effect for four years from the date it is entered by the Court, unless it is earlier terminated pursuant to Paragraph 35, below.

35. Defendant may seek termination of this Consent Decree by bringing a termination motion pursuant to 18 U.S.C. § 3626(b)(1)(A)(i), provided however, that (i) Defendant shall not bring any such motion for a period of two years from the date this Consent Decree is entered by the Court; (ii) any termination motion shall be based on a record of no less than one year of substantial compliance with all the requirements of this Consent Decree and the Remedial Plan; and, (iii) prior to bringing such a motion, Defendant shall have complied with the dispute resolution process described in Paragraphs 28-31, above.

36. Defendant may request a finding by the Court that it is in substantial compliance with one or more material components of the Remedial Plan and shall base such request on evidence that it has maintained such substantial compliance for a period of at least twelve months, provided that, before requesting such a finding, Defendant shall have complied with the dispute resolution process described in Paragraphs 28-31, above. Unless otherwise ordered by the Court, such a finding shall result in a suspension of monitoring of any such material component(s) by the relevant Court expert and Plaintiffs.

37. If Plaintiffs form the good faith belief that Defendant is no longer in substantial compliance with any material component(s) of the Remedial Plan previously found to be in substantial compliance and as to which monitoring has been suspended, Plaintiffs shall promptly so notify Defendant in writing and present a summary of the evidence upon which such belief is based. Within 30 days thereafter, Defendant shall serve a written response stating whether it agrees or disagrees that it is no longer in substantial compliance with respect to that material component of the Remedial Plan. In the event that Defendant agrees, monitoring by the Court experts and Plaintiffs pursuant to this Consent Decree shall resume. In the event Defendant disagrees, Plaintiffs may bring a motion before the Court seeking such relief as may be appropriate, including but not limited to reinstating full monitoring, provided that, before bringing such a

motion, Plaintiffs shall have complied with the dispute resolution process described in Paragraphs 28-31, above.

**J. Costs and Fees**

38. The parties agree that, by entry of this Consent Decree, Plaintiffs shall be considered the prevailing party in this litigation. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, would limit the hourly rates at which Plaintiffs' counsel can be compensated in connection with certain claims in the Action, while other claims are not subject to such statutory limits. Notwithstanding the foregoing, subject to Court approval, the Parties have reached a compromise and Defendant has agreed to pay Plaintiffs' counsel $350,000 as their reasonable fees and expenses incurred from the date of filing of the Complaint in this Action through Final Approval of the Consent Decree, including approval of the Remedial Plan pursuant to the following rates: $420 per hour for attorneys and $200 per hour for paralegals.

39. Plaintiffs shall be compensated for their reasonable time and reasonable expenses (including the costs of any consultants Plaintiffs may retain) relating to monitoring this Consent Decree and Remedial Plan, including any time and expenses incurred in connection with the resolution of any dispute pertaining to such monitoring. Subject to both Court approval and Defendant's right to object either to the payment of all or any portion of the fees or to the reasonableness of the number of hours for which Plaintiffs may seek compensation, and notwithstanding the rates that Plaintiffs potentially could request or would be limited to in any proceedings before the Court, the parties have agreed that Plaintiffs' counsel shall be compensated for monitoring services at the following rates: $420 per hour for attorneys and $200 per hour for paralegals. Plaintiffs shall submit a detailed invoice for their fees and expenses (including the date, amount of time spent, and a general description of each task) at the end of every quarter and Defendant shall pay the amount requested by

Plaintiffs within 60 calendar days of receipt of each invoice, *provided* that Plaintiffs' fees and expenses shall be capped at $150,000 per calendar year. Two years after the approval of this Consent Decree Plaintiffs may request that the yearly cap on fees and expenses should be increased. That request shall be subject to the dispute resolution process set forth in paragraphs 30 and 31, and, if necessary, resolution by the Court. The yearly cap on fees and expenses described in the previous sentence shall not apply to any fees and costs that Plaintiffs may incur in enforcing or defending the Consent Decree and the Remedial Plan in court.

**K. Effect of Consent Decree in Other Actions.**

40. Neither the fact of this Consent Decree nor any statement of claims contained herein shall be used in any other case, claim, or administrative proceedings, except that Defendant and its employees and agents may use this Consent Decree and any statement contained herein to assert issue preclusion or *res judicata*.

41. Nothing in this Consent Decree is intended to modify, revise or change any existing court orders or decrees applicable to Defendant or to operations at or inmates housed in the San Bernardino County Jails including, but not limited to, any orders and decrees in *Haas et al. v. Board of Supervisors of San Bernardino County et al.*, San Bernardino Superior Court No. WHC 4010.

**L. Liability and Necessity for Relief**

42. Defendant admits for the purpose of this lawsuit only that there exists probable cause to believe that violations of the federal rights of plaintiffs have occurred sufficient to warrant the relief contained herein. The parties agree that the relief contained herein is narrowly drawn, extends no further than necessary to ensure the protection of the federal constitutional and statutory rights of Plaintiffs, and is the least intrusive means necessary to accomplish those objectives.

///

**IT IS SO AGREED AND STIPULATED.**

Respectfully submitted,

Dated: March 29, 2018

PRISON LAW OFFICE

By: /s/ Donald Specter
Donald Specter
Margot Mendelson
Sara Norman
*Attorneys for Plaintiffs, on behalf of themselves and others similarly situated*

Dated: March 29, 2018

FUTTERMAN DUPREE DODD CROLEY MAIER LLP

By: /s/ Martin H. Dodd
Martin H. Dodd
*Attorneys for Defendant San Bernardino County*

## ORDER

The Court, having considered the foregoing stipulated Consent Decree, hereby approves and adopts the Consent Decree as the Order of the Court and, in so doing, finds that the relief contained herein is narrowly drawn, extends no further than necessary to ensure the protection of the federal constitutional and statutory rights of Plaintiffs, and is the least intrusive means necessary to accomplish those objectives.

The Court specifically authorizes the appointment, pursuant to FRE 706(b), of Todd Wilcox, M.D., Roberta Stellman, M.D., and Jeffrey Schwartz, Ph.D. and Gary Raney, as Court experts to advise the Court on the County's compliance or non-compliance with the medical care, mental health care and use of force provisions, respectively, of the Remedial Plan, to assist with dispute resolution matters as prescribed in the Consent Decree, and to provide testimony, if required, in any proceedings before the Court. Subject to the approval of the Court, the Court experts shall be entitled to reasonable compensation at the rates set forth in Exhibit B to the Consent Decree and to reimbursement for reasonable expenses incurred in connection with their duties, which shall be paid by Defendant.

Dated: _________, 2018

_________________________
Honorable Virginia A. Phillips
United States District Judge

# EXHIBIT A

# REMEDIAL PLAN
# SAN BERNARDINO COUNTY JAILS

## I. MEDICAL CARE

### A. Medical Records

The San Bernardino County Sheriff's Department ("SBCSD") shall implement an adequate electronic health care record ("EHR") and shall use its best efforts to begin implementing the EHR by February 2016.

i. New inmates. From and after the date the EHR "goes live," medical services for all new inmates, booked into and held in the County jails, will be documented only in the EHR.

ii. Existing inmates. With respect to inmates already housed in the jails as of the "go live" date, all new medical encounters will be reported and recorded in the EHR system. Based on an individualized assessment of clinical necessity, all or portions of the paper medical records for existing inmates will be scanned into the EHR, will be available electronically and will be searchable.

### B. Intake Process

SBCSD shall undertake to hire sufficient nursing staff such that registered nurses, and not correctional staff, shall perform all medical intake screening and assessments for inmates directly booked into West Valley Detention Center ("WVDC") and Central Detention Center ("CDC") or upon transfer to either WVDC or CDC from a Type I jail.

i. Staffing. The County has authorized funding for 14 new registered nurse positions to staff WVDC and CDC and, within 60 days after this Remedial Plan is approved by the Court, shall hire staff to fill those positions. SBCSD has determined that, at current population and utilization levels, the new positions should be sufficient to permit all intake screening and assessments at WVDC and CDC to be performed by nursing staff. Until the positions are filled, SBCSD will hire, and is hiring, contract nurses to staff the open positions. Because the County is having difficulty hiring full time staff to fill the available spots, the County shall review its hiring procedures to determine if structural barriers to hiring exist in its hiring procedures and, if so, will make good faith efforts to overcome such barriers.

ii. Type I Jails. SBCSD shall install the necessary hardware, software and equipment at Type I jails to provide videoconferencing capability ("telemedicine") so that clinical staff at Type II facilities can participate in the intake procedures at Type I jails. The County has installed the hardware, software and equipment for telemedicine capability. Within 60 days after approval of this Remedial Plan by the Court, intake screening and assessment at Type I facilities shall be conducted by clinical staff and may be accomplished utilizing the telemedicine capability. Upon transfer from a Type I facility to a Type II facility, inmates will receive intake screening performed by a nurse.

iii. Intake screening questionnaire. The existing intake screening questionnaire conforms to National Commission on Correctional Health Care ("NCCHC") standard E-02 ("Receiving Screening"). The questionnaire shall be expanded to conform to NCCHC standard E-03 ("Transfer Screening") and E-04 ("Initial Health Assessment") and shall include specific questions regarding suicide risk factors, withdrawal risk factors, tuberculosis symptoms, a detailed mental health history, a mental status exam and a physical exam and shall conclude with the disposition status on allergies, medical follow-up, chronic disease enrollment, tuberculosis screening plan, withdrawal management and ADA issues. The EHR is anticipated to comply with this provision of the plan.

iv. Conditions of arrest. The intake screening process shall continue to include questions directed to the arresting officer about the circumstances of arrest, including any force utilized and the officer's observations of the condition of the inmate. The EHR is anticipated to comply with this provision of the plan.

v. Vital signs. During the intake process, staff shall complete a full set of vital signs, including admission weight and obtain a medical history from the inmate/patient and verify and appropriately document the current medications and dosages from a reliable source. The EHR is anticipated to comply with this provision of the plan.

vi. Tuberculosis screening. SBCSD shall implement a tuberculosis ("TB") screening protocol that conforms to the Centers for Disease Control guidelines on the prevention and control of tuberculosis in correctional facilities for all inmates booked into Type II jails. SBCSD may continue to perform symptom screening upon intake at Type I jails, provided that upon transfer from a Type I to a Type II jail, an inmate will be tested pursuant to the TB screening protocol. In the event an inmate is released before the test can be read, the inmate shall receive information directing him/her to have the test read at an appropriate medical facility.

vii. Transfer between jails. When inmates are transferred from a Type I facility to a Type II facility the original receiving screening will be reviewed by the Intake RN who shall complete a comprehensive health assessment prior to housing the inmate at the Type II facility.

viii. Implementation. The changes to the intake process described above are being and will continue to be implemented as increases in staffing permit. Full implementation, however, will not be considered complete until the County has met clinical staffing goals, the kiosk system described below is installed and is fully operational, and meaningful utilization of the EHR has commenced.

ix. Intake at High Desert Detention Center ("HDDC"). Within 60 days after approval of this Remedial Plan by the Court, intake screenings and assessments at HDDC shall be conducted by registered nursing staff.

x. SBCSD has revised and adopted and is implementing its withdrawal

assessment and treatment protocols to conform to NCCHC standard J-G-06 ("Intoxication and Withdrawal") contemporary community standards, including specific assessment protocols for alcohol, opiate and benzodiazepine withdrawal and structured and scheduled nursing encounters for the sobering cell process.

**C. Infection Control Processes**

i. SBCSD has reviewed and amended its policy regarding provision of soap and personal grooming items to inmates so as to ensure, to the degree feasible, that inmates have such items available to them at all times. In particular, as of December 2015, inmates receive two bars of "hotel size" soap from the commissary in their "Welfare Bag."

ii. As of December 2015, SBCSD has reviewed the number of waterless hand sanitizer dispensers, and restrooms available to enable custody staff, healthcare staff and visitors to sanitize their hands in all patient care areas, visiting areas and staff areas and has determined there are adequate dispensers and facilities available. SBCSD will ensure on an ongoing basis that the provided locations have the necessary products for infection control.

iii. SBCSD has amended its current Detentions and Corrections Manual Grooming Equipment Policy No. 925.00 regarding the cleaning and disinfecting of grooming equipment to comply with all applicable local, state and national requirements and standards, and thereafter ensure continued compliance with the existing or amended policy.

**D. Sick Call Process/Health Care Requests**

i. SBCSD has implemented an electronic, kiosk system to permit inmates to make a variety of requests. SBCSD shall ensure that the kiosk system is configured to permit inmates to make non-urgent and non-emergent health services requests through the kiosk terminals, that the requests are sent electronically directly to health service personnel, that inmates shall have the ability to track electronically the status of their requests and that the health care request system complies with NCCHC standard J-A-01 ("Access to Care"). SBCSD will also provide signage and notices on the kiosk screens to explain to inmates how to make requests for urgent or emergent health care needs.

ii. SBCSD shall ensure, at a minimum, continued compliance with Detentions and Corrections Health Services Division Operational Procedural Manual Policy No. 306, regarding the sick call process, as well as NCCHC standards J-E-07 (regarding non-emergency health services requests) and J-E-08 (regarding emergency services). NCCHC standard J-E-07 requires a face-to-face encounter with the inmate within 48 hours on weekdays and 72 hours on the weekend. Nevertheless, SBCSD will make good faith efforts to have inmate-patients see a clinician for a face-to-face encounter within 24 hours of a sick call request.

**E. Specialty Care**

SBCSD shall implement a comprehensive specialty clinic scheduling procedure with accountability for the entire Department. The EHR is anticipated to comply with this provision.

That system shall require the following:

i. Emergency consultations or procedures shall be provided immediately.

ii. Urgent consultations or procedures shall be scheduled to be provided in 14 days.

iii. Routine consultations or procedures shall be scheduled to be provided within 90 days.

iv. Develop and implement a tracking system that identifies and documents the specialty referral date, the date the referral was sent to the clinic, the date the appointment is confirmed, the date the appointment is completed, and, if the appointment is rescheduled or canceled, the reason therefor.

v. Specialty care documentation from an outside source shall be evaluated by a provider (MD, NP or PA) promptly upon the patient's return to the facility. Recommendations from the specialist shall be reviewed by the Chief Medical Officer and implemented as ordered. The provider shall make a clinical judgment about whether seeing the patient is necessary, and, if so, when.

**F. Death Review Process**

SBCSD is complying and will continue to comply with NCCHC standard J-A-10 ("Procedure In the Event of an Inmate Death") which provides that that all In-custody deaths are to be reviewed to determine the appropriateness of clinical care; to ascertain whether change to policies, procedures, or practices are warranted; and to identify issues that require further study. All deaths shall be reviewed within 30 days with the information then available and again when the Coroner's report is available. The death review shall consist of an administrative review, a clinical mortality review, and a psychological autopsy if death is by suicide and a written report shall be prepared. Corrective actions identified through the mortality review process shall be implemented and monitored through the facility's CQI program for systemic issues, and through the staff education program for staff related issues.

**G. Nursing Culture**

Clinical staff shall be issued, and be required to wear, identification tags that indicate their licensure (e.g., RN, MD), their first name and last initial.

**H. Continuous Quality Improvement**

SBCSD shall continue to bring its Continuous Quality Improvement ("CQI") process into compliance with NCCHC Standard J-A-06 ("Continuous Quality Improvement") and to ensure that its CQI process meets such standard. SBCSD has hired a Supervising RN II to oversee the CQI program and full implementation of the CQI program shall occur by March 30, 2018.

### I. Diagnostics

SBCSD operates a number of specialty clinics at WVDC. SBCSD will continue to consider new technologies and methodologies in the event that it may become appropriate to establish an on-site diagnostics laboratory to complement the existing clinics.

As of January 1, 2016, SBCSD has developed and is implementing a policy to ensure that all laboratory results are returned to the provider within a clinically appropriate time.

## II. MENTAL HEALTH CARE

### A. Organizational Structure

SBCSD has developed and shall continue to implement a comprehensive organizational chart that clearly defines the scope of services, chains of authority, performance expectations and standards of mental health services via approved and implemented policies.

i. Each psychiatrist shall be assigned to a housing unit for service delivery. Patients will be scheduled to see their assigned psychiatrists whenever possible to ensure continuity of care.

ii. Mental health staff will immediately maintain at each jail facility an accurate mental health case list ("caseload") which at a minimum lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating psychiatrist.

iii. Mental health staff will maintain accurate logs for suicide watch, use of seclusion or restraints, administration of involuntary medications, hospital and emergency room referrals and admissions, 5150 holds, patients who have been assigned treatment guardians, patients in specialized housing unit by location, and patients who refuse medications.

### B. Policies and Procedures

i. SBCSD has adopted and is implementing policies and procedures that include the following:

a. A complete menu of current mental healthcare programming and services.

b. Minimum and maximum timeframes for when each type of mental healthcare service will be completed, including but not limited to laboratory tracking and psychiatry follow-up services, in accordance with NCCHC and professional standards.

c. An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff concerns pertaining to mental healthcare.

d. Specific credentialing requirements for the delivery of mental healthcare services, including but not limited to the following: (a) only licensed mental health professionals may make critical treatment decisions; (b) unlicensed healthcare staff will not restrict access to higher levels of service or independently diagnose patients; and (c) the minimum staffing credential required to classify patients as having a seriously mentally illness ("SMI").

e. The following definition of "serious mental illness" taken from APA, *Psychiatric Services in Correctional Facilities* (3d ed.), pp. xvi-xvii that will apply to the Remedial Plan: "Psychiatric disorders that include psychotic symptoms, at least on an intermittent basis, are uniformly considered to meet the criteria for [serious mental illness]. Schizophrenia, schizoaffective disorder, and delusional disorder are examples of such serious mental illnesses. Other mental or emotional disorders (e.g., major depression, bipolar disorder, posttraumatic stress disorder), whether acute or chronic, that result in serious distress or serious functional impairment that substantially interferes with or limits one or more major life activities almost always meet criteria for [serious mental illness]. Some prisoners with severe personality disorders, cognitive disorders, or adjustment disorders will meet such criteria either temporarily or chronically."

f. Clear definitions of all abbreviations.

g. Clear directives for clinical monitoring of inmates, including but not limited to those who are involuntarily medicated, restrained or secluded, segregated or on suicide watch.

h. Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff members who have the authority to place inmates in specialized mental health housing.

i. Mental health assessments for those designated as SMI should be performed by a licensed mental health professional to determine if mitigating factors are present and most importantly if the inmate cannot tolerate placement in a segregated environment and should be diverted for specialized mental health housing or suicide watch.

j. Procedures for conservatorships, guardianships, involuntary medications, and other appropriate measures for the management of inmates with serious mental illness who lack the capacity to give informed consent, in accordance with relevant state law.

k. Training for all staff members who are working with special needs and mentally ill inmates in all aspects of their respective duty assignments.

ii. The official operating manual for all mental healthcare services shall be SBCSD policies and procedures. Any process flowcharts that are developed shall be attached to the corresponding policy.

iii. Mental health care staff and custody staff in mental health, suicide prevention, and intake units, have been and will continue to be trained with respect to the

policies and procedures. All other custody staff will be trained with respect to the revised policies and procedures within 12 months after adoption of SBCSD's revised policies and procedures.

## C. Staffing

i. SBCSD will complete a staffing analysis by January of each year, commencing in 2017 for the purpose of estimating an adequate number of mental health professionals, both psychiatrists and counselors, required to provide mental health services that meet professional standards of care and the requirements of this Remedial Plan. This analysis will be based on accurate data that reflects the expected number of contacts for each contact type and estimates of the average amount of timed needed to complete an adequate contact.

ii. SBCSD shall provide and maintain sufficient staff, including but not limited to licensed mental health professionals, to meet professional standards of care and to execute the requirements of this Remedial Plan. At least 90% of the mental health staff positions shall be filled with staff attending work (and not on leave or otherwise not regularly attending work) within 12 months of the date the Consent Decree is issued by the Court.

iii. By April 1, 2018, SBCSD shall ensure that at least one licensed mental health professional is on site 24 hours a day at West Valley Detention Center (WVDC) to complete comprehensive assessments on inmates deemed an emergent referral, inmates considered for suicide watch, pre-segregation assessments of inmates consistent with SBCSD policies and procedures, and crisis calls.

iv. SBCSD shall immediately develop and maintain staffing documents that timely and accurately track staffing levels, shift and duty assignments, work locations, and shortages.

v. SBCSD shall provide and maintain sufficient correctional staff to transport and escort inmates for mental health services in confidential settings, and to provide direct security supervision in specialized mental health housing units during programming and activity hours.

## D. Medication Administration

i. Nursing staff shall verify psychiatric medications at intake. Inmates with verified, current prescriptions written by SBCSD providers and that have not expired will have their prescriptions continued with the verbal approval of the on-call psychiatrist. Psychiatrists will review and order as appropriate within 24 hours of intake all verified prescriptions.

ii. The first doses of medications will be administered within 24 hours of a doctor's order.

iii. SBCSD shall develop a policy that adequately addresses inmates' refusals of psychiatric medications and implement an appropriate procedure to notify clinicians of

medication non-compliance.

iv. Some psychiatric medications shall be available only through non-formulary ordering procedures when the pharmacy and therapeutics committee in conjunction with the psychiatric medical director determines there are significant patient safety issues.

**E. Clinical Services and Practices**

i. SBCSD shall develop and implement policies and procedures that incorporate guidelines for laboratory studies and monitoring metabolic syndrome for inmates prescribed psychiatric medications.

ii. Clinicians (qualified mental health professionals) shall have access to the medical record for all scheduled clinical encounters and may request and receive archived records for an inmate with a history of serious mental illness and previous incarcerations.

iii. Clinicians shall provide counseling services to inmates based on individualized needs and as clinically appropriate.

**F. Suicide Prevention**

i. Clinicians shall complete and document a suicide risk assessment, including the use of a suicide risk assessment tool, during all initial mental health encounters for inmates on suicide watch.

ii. All initial mental health encounters by a QMHP ("Qualified Mental Health Professional") or psychiatrist will include a comprehensive assessment excluding communications via a unit rounds encounter.

iii. SBCSD shall maintain the capacity to offer counseling services to inmates on suicide watch and psychiatric observation as clinically indicated or when ordered by a psychiatrist.

iv. SBCSD has modified and, as modified, will implement its policy regarding use of a safety cells to allow for frequent out of cell restroom access and provision of suicide resistant smocks, blankets and bedding, etc. unless there is written documentation that the inmate uses these items in such manner so as to prevent safe monitoring of their behavior.

v. Inmates who are at the highest risk of suicide or self-injury shall receive constant face-to-face observation followed by a lower level of a staggered 15-minute watch.

vi. Correctional officers will ensure that inmates maintained on suicide watch and placed in holding cells with pony walls or other sight obstructions remain in the line of sight of correctional staff at all times until clinical staff assess and assign a level of suicide risk and appropriate monitoring intervals.

vii. Whenever possible, inmates who require suicide and other psychiatric close observation will be housed in a health services unit specifically designed for this purpose or other health monitoring. But in all events, inmates on suicide watch must be housed in suicide resistant cells.

viii. Inmates restrained in a chair shall never be housed in a locked cell unless they are under constant face-to-face supervision.

ix. SBCSD shall provide all inmates on suicide watch with suicide resistant smocks, blankets and bedding at all times, unless a psychiatrist restricts these items for safety purposes based on a comprehensive assessment.

x. The suicide prevention policy shall require instruction to security staff on the frequency of checks and procedures to ensure an adequate safety check has been completed and documented.

xi. Whenever staff and inmate safety permits, inmates on suicide watch shall receive psychiatric interviews in a sound private environment conducive to establishing therapeutic rapport. Psychiatrists and correctional staff will jointly decide whether the interview room door will remain open or if correctional staff will be in the room. In situations where the psychiatrist and the correctional officer cannot reach a resolution, the security supervisor will make the decision. Staff will document any reasons why clinical encounters could not be conducted out of cell or with sound privacy.

xii. Correctional staff will offer inmates on suicide watch showers on a regular schedule.

xiii. Cognitive behavior and supportive counseling shall be available when appropriate to inmates on suicide watch.

xiv. QMHPs will evaluate inmates released from suicide watch within 24 hours of their release.

xv. Psychiatrists will evaluate inmates released from suicide watch based on individualized needs.

xvi. Psychiatrists shall meet with correctional officers to review any inmates housed on suicide watch for more than three days. These meetings will be documented in the form of minutes (stored and maintained by mental health staff) or by entry in the individual inmate's record.

xvii. SBCSD will provide all security staff with eight hours of initial training and two to four hours of training annually regarding suicide prevention and the identification and approach to mentally ill inmates. All healthcare staff should receive a minimum of 2 hours of training annually on suicide prevention and the identification of mentally ill inmates.

**G. Patient Privacy**

i. Clinicians will complete all clinical encounters in a sound private environment conducive to establishing therapeutic rapport, such as in individual office space, whenever safely possible.

ii. SBCSD will identify and provide space for the delivery of frequent and adequate mental healthcare services in appropriate therapeutic settings for inmates in specialized mental health housing and segregation.

**H. Specialized Mental Health and Segregation Housing**

i. SBCSD shall develop and implement programming and mental healthcare services for inmates (male and female) with serious mental illness who cannot be housed in general population. These inmates will no longer be classified as "UB," and instead will be classified as "SMI" (seriously mentally ill) that will be defined in the policies and procedures.

ii. SBCSD shall develop a policy and procedure pertaining to admitting criteria for existing and future specialized mental health housing units.

iii. Inmates with serious mental illness who cannot be housed in general population will be provided with increased out-of-cell time and structured therapeutic activities appropriate for the acuity of their mental health needs. Such inmates who are locked down for any reason other than psychiatric observation will be offered a minimum of 10 hours per week of unstructured out-of-cell time and 5 hours per week of structured out-of-cell time. All out-of-cell time shall be documented, indicating the type and duration of the activity.

iv. Those inmates with a serious mental illness who also require special mental health housing, once developed and staffed, will receive enhanced clinical monitoring and programming as dictated by policy and procedure.

v. SBCSD shall monitor and conduct rounds for all inmates in segregation in accordance with NCCHC Standard J-E-09 ("Segregated Inmates"). Nursing staff shall immediately report signs of psychological decompensation to mental health staff. Clinicians shall evaluate inmates identified as having mental health needs during these rounds in a sound private space outside of the inmate's cell.

vi. Prior to placement or within the next shift if placement is after the normal hours for clinical coverage, all inmates identified as SMI shall be screened face to face by a licensed mental health clinician to determine whether there are any mental health contraindications to segregation. If the clinician finds there are any mental health contraindications to segregation, that inmate shall not remain in segregation absent extraordinary and exceptional circumstances but rather be moved to psychiatric observation for evaluation and stabilization. Any extraordinary and exceptional circumstances shall be documented and reviewed by mental health and custody supervisors. SMI inmates with serious mental illness who are placed in segregation for more than 24 hours shall have their cases reviewed by the

security supervisor and the mental health supervisor on a weekly basis to determine if they can be diverted or removed from segregation.

**I. Record Keeping**

A mental health expert, approved by both parties, shall review SBCSD's proposed electronic health forms and make recommendations for modifications and additions.

**J. Treatment Planning**

i. Clinicians ensure that each inmate on the mental health caseload receives an individualized treatment plan as part of the initial mental health assessment that reflects actual services that will be provided to that person. This plan is the "Plan" portion on the assessment template in the electronic health record and usually consists of referrals to psychiatry, programming activities or individual counseling, discharge planning and specialized mental health housing. Thereafter, for inmates in the general population, their treatment plan is the progress note section documenting the clinical plan.

ii. Individualized treatment plans for inmates housed in specialized mental health programming units shall be documented on a free-standing multidisciplinary form in a problem-oriented format to be reviewed and approved by the appointed mental health expert. A policy and procedure will be revised to direct this process.

**K. Disciplinary Process**

SBCSD shall ensure that disciplinary charges against SMI inmates are reviewed by a clinician to determine the extent to which the charge was related to mental illness or a developmental disability and to ensure that the inmate's mental illness or developmental disability is used as a mitigating factor, as appropriate, when punishment is imposed and to determine whether placement into segregation is appropriate. SBCSD shall develop a policy, procedure and form for input from mental health staff into the disciplinary process for SMI inmates with pending major disciplinary sanctions. Data from this process should be tracked to ensure compliance with the policy.

**L. Discharge Planning**

i. SBCSD shall ensure that SMI inmates in specialized mental health units prescribed psychiatric medications have access to transitional prescription(s) immediately upon release from jail.

ii. Inmates with SMI on specialized mental health units will receive enhanced discharge planning as defined by policy and include at a minimum documented assistance with housing, individualized treatment plan driven after care appointments and services, health insurance applications, other benefit services and hospitalization, if clinically indicated via a 5150.

iii. Inmates on the mental health caseload in general population shall receive an initial discharge needs assessment and plan at the time of their initial comprehensive assessment. All community resources shall be listed in the inmate orientation materials on the electronic kiosks so that all inmates can determine which services they wish to access. Inmates should be informed via orientation materials that they can request assistance from a social worker through the normal request for service process should they need additional advice regarding discharge preparations.

**M. Continuous Quality Improvement**

i. SBCSD shall develop a Continuous Quality Improvement ("CQI") Program which will adhere to NCCHC standard J A-06. The CQI process shall be site-specific and include review of the delivery of mental healthcare services. The SBCSD health manager and the medical, psychiatric, dental, and nursing directors will attend and participate in this process at a minimum of every quarter. Formal minutes will be taken and maintained whenever the committee convenes.

ii. Consistent with NCCHC standard J-A-06, the CQI process shall include the development of accurate tracking mechanisms to permit the monitoring, timeliness and effectiveness of care, shall ensure at least annual review of such mechanisms, and shall recommend corrective action for all deficiencies. SBCSD has developed, shall utilize and shall regularly review, update and modify as appropriate, a Quality Assurance matrix that is organized by clinical process and tracks essential indicators for monitoring the timeliness and quality of services, which shall be made available to counsel for monitoring.

iii. The CQI process studies shall include (a) a clearly articulated hypothesis and methodology to determine if standards have been met, including a sampling strategy; (b) data collection; (c) analysis of data to identify trends and patterns; (d) analysis to identify the underlying causes of problems; (e) development of remedies to solve problems; (f) a written plan that identifies responsible staff and establishes a specific timeline for implementing remedies; (g) follow-up data collection; and (h) analysis to determine if the remedies are effective.

iv. SBCSD will conduct peer and supervisory reviews of all clinicians at least annually to assess compliance with policies and procedures and professional standards of care per NCCHC standard J-C-02.

## III. DENTAL CARE

**A. Definitions in Oral Care Policy**

SBCSD shall revise San Bernardino County Sheriff's Department, Detention and Corrections Bureau, Health Services Division, Operational Procedure Manual, Policy No. 324, entitled "Oral Care" ("Policy No. 324"), to distinguish between routine, urgent and emergency dental care and to define "restorative" dental treatment.

### B. Requests for Dental Services

Policy No. 324 shall be revised to provide clarify how inmates should request routine, urgent or emergency dental care services, including where, when and by whom treatment will be provided for each level of services, including specifically the relevant time frames within which each level of service will be provided. In addition, Policy No. 324 should clarify the triage process for determining whether care requested is routine, urgent or emergent and how referrals to other health services are made.

### C. Preventive Care

In addition to providing instruction in oral hygiene and preventative education, SBCSD shall include in Policy No. 324 a provision that inmates will be provided with toothpaste and appropriate interdental cleaners to facilitate oral hygiene and preventative care.

## IV. USE OF FORCE

### A. Use of Force Policy

By April 30, 2018, SBCSD shall adopt, complete staffing training on, and implement the Use of Force policy attached hereto as **Exhibit 1**.

### B. Training

Every custody staff member and academy attendee shall receive at least six (6) hours of initial training with respect to the policy to ensure that each such staff member fully understands the expectations, restrictions and their obligations with respect to using and reporting force.

Supervisory staff who will investigate use of force incidents shall receive adequate training on how to conduct such investigations and how to deal promptly with obvious staff misconduct.

### C. Other Matters for Consideration

i. SBCSD shall consider developing and adopting some form of Early Warning System to identify staff who require further training and/or correction in the use of force.

ii. SBCSD shall consider whether and to what it extent it can or should utilize a direct supervision model of inmate supervision in the jails.

//

//

## IV. RESTRICTIVE HOUSING

### A. Definitions

i. "Restrictive Housing" shall mean a placement that requires an inmate to be confined to a cell at least 22 hours per day for the safe and secure operation of the facility. (See American Correctional Ass'n, "Restrictive Housing Performance Based Standards," (August 2016), p. 3.)

ii. "Serious mental illness" shall have the meaning set forth in Section II.A.5 of this Remedial Plan.

### B. General Principles

i. By December 31, 2017, SBCSD shall develop, adopt and implement policies and practices which mitigate the potential harmful effects of isolation and ensure that inmates shall be housed in the least restrictive setting necessary for their own safety, as well as the safety of staff, other inmates, and the public.

ii. The changes described above will impact rules and policies related to classifications, housing, discipline, privileges, and programing, to the extent necessary to achieve the goals outlined above.

iii. To the greatest extent feasible, SBCSD policies and practices shall be modified to eliminate routine, widespread, and long-term use of restrictive housing.

iv. The Parties stipulate that adoption and implementation of the policies attached as **Exhibit 2** satisfy the policy requirements of this remedial plan.

### C. Restrictive Housing and Inmate Classifications

The policies and practices adopted pursuant to this remedial plan shall maximize both "tier time" and outside recreation time for all classifications of inmates.

### D. Restrictive Housing for Disciplinary Purposes

i. SBCSD policies shall state that an inmate may be confined in restrictive housing for disciplinary purposes after the inmate has received notice of the charges against him/her, a shift supervisor has conducted a disciplinary hearing at which the inmate was given an opportunity to rebut the charges and the inmate is adjudicated guilty of the alleged violation.

ii. Because isolation can, in some circumstances, exacerbate an inmate's behavioral issues, SBCSD shall ensure that:

a. The maximum disciplinary sanction shall include no more than 30 consecutive days of restrictive housing.

b. Inmates receiving multiple discipline violations arising from a single incident shall be disciplined only for the most serious offense.

c. Any inmate who is repeatedly returned to disciplinary restrictive housing with no apparent change in behavior or substantial breaks between disciplines will be assessed by a multidisciplinary team that will consider alternatives to disciplinary restrictive housing and develop and implement an individualized behavior plan for the inmate.

iii. SBCSD shall review its administrative charging practices to ensure clarity and consistency and that penalties imposed are not excessive. The Corrections Bureau will add definitions of offenses (e.g. "Major Disturbance") where necessary to ensure that penalties for similar infractions are imposed consistently.

iv. SBCSD shall review the use of the disciplinary diet. As part of this review the Corrections Bureau will conduct a 6-month study at one of the Type II facilities during which the disciplinary diet will not be used as a disciplinary sanction. At the conclusion of the study period, SBCSD will reassess whether, and to what extent, it will continue to utilize the disciplinary diet. SBCSD's decision shall be subject to the dispute resolution process set forth in the Consent Decree.

**E. Restrictive Housing and Inmates with Serious Mental Illness**

i. If, and when, Mental Health Services determines that an inmate with a serious mental illness should be housed in some form of clinical segregation to facilitate safe and proper treatment of the inmate, SBCSD correctional staff shall accommodate that housing request, even where the requested clinical segregation would meet the definition of restrictive housing. This clinical segregation shall occur only pursuant to orders of Mental Health Services and shall continue only for as long as clinically indicated.

ii. Before an inmate with a serious mental illness is found guilty of misconduct or, as a result of an adjudication of guilt, is placed in segregated housing (as that term is defined in Section II.H. of this Remedial Plan), SBCSD shall have complied with Section II.K. of this Remedial Plan.

**F. Conditions, Privileges, and Programming**

i. Any cells used for restrictive housing shall meet the same minimum standards as those applicable to other inmate accommodations.

ii. The conditions, privileges and programming for inmates with serious mental illness who are segregated from the general population shall be governed by Section II.H. of this Remedial Plan.

iii. If an entire classification of inmates is in restrictive housing for a period of 30 days or more, those inmates shall be provided privileges and programming which are the same or equivalent inmates who are not in restrictive housing.

## V. AMERICANS WITH DISABILITIES ACT COMPLIANCE

Within 60 days after approval of this Remedial Plan by the Court, SBCSD shall adopt and implement the policies attached hereto as **Exhibit 3.**

# EXHIBIT 1

## 14.100. USE OF FORCE

**100.00. INTRODUCTION:** The Sheriff's Department has a responsibility to provide a safe working environment for staff, a safe custody environment for the inmates, and to provide for community safety. The use of force will sometimes be necessary to accomplish these goals. The use of force is only authorized as specified by this policy. Any use of force must be objectively reasonable given the totality of the circumstances known by the deputy at the time the force was used. Deputies will fully document every use of force, including their perceptions at the time the force was used, and the extent of any injuries, as well as any efforts made to avoid or limit the amount of the force used. The Sheriff's Department shall review every use of force, and hold employees accountable when the force used was objectively unreasonable given the totality of the circumstances. Unreasonable force includes any force used for an improper purpose, and any force which would be considered excessive or unnecessary from the perspective of a reasonable deputy in the same circumstances. A violation of any provision of this policy may be grounds for discipline, up to and including termination.

Staff are expected to treat inmates with respect, maintain professionalism, and prevent the use of force when possible through constructive interactions and effective communication with inmates. The Department expects that deputies will be able to manage many challenging situations without the need for physical force.

**100.05. SCOPE OF POLICY:** This policy applies specifically to staff working inside any jail facility and during the transportation of inmates.

**105.00. REASONABLE FORCE:** The use of force must always be objectively reasonable given the totality of the circumstances at the time the force was used. Deputies may use force only when it is a necessary response to a particular situation, and even when force is justified, deputies must use only the amount of force that is appropriate under the circumstances.

When reasonable alternatives, other than the use of force, are either impractical, unavailable, or have been tried and were unsuccessful, a reasonable amount of force may be used to:

- Prevent injury, death, escape or the commission of a crime;
- Compel compliance with jail regulations or a lawful and reasonable order after the inmate has demonstrated a refusal to comply voluntarily;
- Assist medical staff with the lawful administration of involuntary anti-psychotic medication; and

- Enforce a lawful court order.

Even in the situations listed above, if, based on the circumstances, no amount of force is reasonable, then a deputy is not permitted to use force.

There must be a relationship between the need for the use of force and the amount of force used. The level of force used by the deputy must be justified by the necessity of the objective and additionally, in some cases, the inmate's level of resistance.

**105.05. SELF-DEFENSE OR DEFENSE OF OTHERS:** A deputy may always use reasonable force to protect him or herself or others from bodily injury. If a deputy reasonably believes that an inmate poses a threat of death or serious bodily injury and conventional force options are impractical, unavailable, or have been tried and were unsuccessful, the deputy may use force which would otherwise be prohibited, so long as the force used is objectively reasonable.

**105.07. LEVEL OF FORCE:** The level of force is determined by considering both the type of force used and the amount of force used. A lower level use of force can be used to reduce the need for greater force, but a deputy is not required to attempt a lower level use of force before resorting to greater force, so long as the force used is reasonable.

**105.10. PROHIBITED FORCE:** A deputy may not use force (1) when there is no legitimate need for force, (2) in an amount or in a manner that is excessive, or (3) after force is no longer necessary to control the inmate. It is never acceptable for a deputy to use force for retaliation, intimidation, or punishment. Unless an inmate has made clear, immediate, unconditional, or specific verbal threats and poses an immediate physical threat to the deputy or others, it would be a violation of this policy for a deputy to use force solely in response to an inmate's swearing at, yelling at, or otherwise verbally provoking the deputy.

Except when a deputy reasonably believes that an inmate poses an imminent threat of serious bodily injury and other types of force are impractical, unavailable, or have been tried and were unsuccessful, deputies shall not:

- Direct punches, knee strikes or kicks to the head, face, neck, spine or groin;
- Intentionally strike an inmate's head or face against a wall, floor, or other hard fixed object;
- Use force that restricts the inmate's ability to breathe (except in the limited circumstances described in section 115.05);
- Use a carotid restraint;

- Use an unconventional or unauthorized weapon against an inmate; or
- Use an authorized weapon against an inmate in an unauthorized manner or if the deputy has not been trained in the use of that weapon.

**110.00. EFFORTS MADE TO AVOID OR TEMPER THE SEVERITY OF A FORCEFUL RESPONSE:** Deputies should not unnecessarily provoke or worsen a volatile situation by antagonizing an inmate or inmates. Deputies may not:

- Intentionally incite inmate-on-inmate, inmate-on-staff or staff-on-inmate violence;
- Intentionally degrade, taunt or antagonize an inmate;
- Direct racial, ethnic, homophobic or other slurs at an inmate; or
- Continue to interact with an inmate when such interaction is unnecessary and is antagonizing the inmate (for example, following a use of force or a serious verbal confrontation between a deputy and an inmate, if staffing levels permit, it is preferable to have an uninvolved deputy escort the inmate to medical, holding, or segregation).

Deputies should make reasonable efforts to avoid a use of force or to minimize the force that is needed by using techniques that involve some combination of communication, time and distance in an attempt to gain voluntary compliance. For example, deputies should consider:

- Giving an inmate time to calm down and become less agitated;
- Attempting to de-escalate or defuse the situation by utilizing effective communication with an inmate, as opposed to only giving orders;
- Giving clear and direct orders to inmates, and giving them a reasonable amount of time to comply;
- Consulting with a mental health professional about possible causes of an inmate's behavior, and/or allowing a mental health professional to directly counsel the inmate; and/or
- Using a lower level of force, such as Oleoresin Capsicum ("OC").

In any situation where a use of force has occurred or can reasonably be anticipated, staff shall call a supervisor to the scene as soon as practicable and safe to do so.

**110.05. SPECIAL CONSIDERATIONS WITH USE OF FORCE AND SERIOUSLY MENTALLY ILL OR SELF-HARMING INMATES:** A jail Mental Health professional can classify an inmate as seriously mentally ill ("SMI") when appropriate. When faced with a potential use of force situation involving a SMI inmate, custody staff should attempt to use their Crisis Intervention Training (CIT) to gain voluntary

compliance. If CIT is unsuccessful, if practicable and safe to do so, a mental health staff member should be called to the scene both to consult with staff and attempt to talk the inmate into compliance. If the inmate is the subject of a behavior plan, the mental health staff member should follow the plan. When appropriate, Mental Health staff shall recommend giving the SMI inmate time to calm down and become less agitated. Mental Health staff shall determine what amount of time is appropriate given the circumstances and the particular inmate's diagnosis and level of agitation. Staff shall follow the recommendations of Mental Health staff when safe to do so. If the SMI inmate is secured in a cell, nonessential staff should withdraw from the immediate area if safe to do so. If a mental health staff member tells deputies that the SMI inmate lacks either the ability to understand or comply with commands, the deputies should not use force techniques solely designed to gain voluntary compliance.

A self-harming inmate who is actively trying to cause harm to his/her self can cause serious and permanent harm at any moment. In those situations staff are authorized to use force immediately after an initial attempt to gain voluntary compliance fails.

**110.07. PREGNANT INMATES:** The Taser should not be used when the subject is obviously, or known to be, pregnant. An inmate known to be pregnant or in recovery after delivery shall not be restrained by the use of leg irons, waist chains, or handcuffs behind the body. A pregnant inmate in labor, during delivery, or in recovery after delivery, shall not be restrained by the wrists, ankles, or both, unless deemed necessary for the safety and security of the inmate, the staff, or the public. In such cases, the watch commander shall be advised as soon as possible. Whenever practical and safe to do so, staff should seek approval from a watch commander prior to applying restraints to a pregnant inmate in labor, during delivery, or in recovery after delivery. Restraints shall be removed when a professional who is currently responsible for the medical care of a pregnant inmate during a medical emergency, labor, delivery, or recovery after delivery determines that the removal of restraints is medically necessary.

Use of the restraint chair on an inmate known to be pregnant is prohibited.

**110.10. STAFF RESPONSIBILTY TO AVOID, PREVENT, AND REPORT EXCESSIVE FORCE:** Any employee who becomes aware of possible misconduct by another employee of this Department, shall immediately notify a supervisor. See Department Manual section 1.678.15, "Duty to Report Misconduct." Inmate verbal requests to speak to a supervisor shall be conveyed to a supervisor within a reasonable time.

Deputies have a duty to prevent each other from using excessive force. In those circumstances, a deputy shall take appropriate action based on the information known to the deputy at the time, consistent with safety and security, in an effort to reduce or stop the force being used, and must notify a supervisor.

Any reports of excessive force shall be documented and investigated.

When a complaint of excessive force is submitted as an inmate grievance, the standard grievance process may be used to document the complaint, investigation, and final determination. Should it appear to the supervisor reviewing the grievance that a complaint of excessive force may be substantiated or requires substantial additional investigation, the supervisor shall notify the facility commander.

If a supervisor conducting a use of force investigation receives a complaint of excessive force arising out of the incident under investigation, then the supervisor shall document and investigate the complaint as part of the use of force investigation. If it appears to the supervisor conducting the use of force investigation that a complaint of excessive force may be substantiated or requires substantial additional investigation, the supervisor shall notify the facility commander.

The facility commander shall ensure the allegation of excessive force is documented and shall determine how such complaints will be investigated. The facility commander may choose to conduct an administrative investigation at the facility or may request that the Internal Affairs Division conduct the investigation. Except in extraordinary circumstances, excessive force investigations at the facility level shall not be conducted by a supervisor who participated in, or witnessed, the use of force.

In resolving a grievance alleging excessive force or an investigation into excessive force, if the supervisor decides the information does not warrant notifying the facility commander, then after the supervisor's investigation is complete the facility commander shall review and either approve the completed investigation or refer the incident for further action.

**115.00.** **MEDICAL TREATMENT:** Staff shall ensure Health Services personnel are notified after any Level II or III Use of Force (defined below). Health Services shall assess the condition of every inmate involved in any Level II or Level III Use of Force incident, as soon as practical following the incident.

An inmate who refuses medical assessment or treatment must make the refusal to a member of Health Services. An inmate's statement to a deputy that the inmate intends to refuse medical treatment will not justify the deputy's failure to notify Health

Services. Health Services personnel shall document an inmate's refusal of assessment or treatment in the inmate's medical record.

If a Use of Force is first reported by an inmate to a member of Health Services, the member shall document the claim in the inmate's medical record and notify a watch commander.

**115.05. COMPRESSIONAL ASPHYXIA:** During use of force incidents, staff shall be aware of, and attempt to mitigate, the risks associated with "compressional asphyxia." Staff shall avoid, to the extent possible under the circumstances, placing their weight on an inmate's upper back or torso in a way that compresses the chest and/or impairs the inmate's breathing. If a deputy places his or her weight on the inmate's upper back or torso in order to apply restraints, once the inmate is secured and compliant staff shall place the inmate in a recovery position. In any use of force, but particularly in those instances in which staff may have placed weight on the inmate's back or torso, staff shall look for signs that the inmate is having difficulty breathing. If an inmate has difficulty breathing, or says that he or she can't breathe, medical assistance shall be called for immediately.

**120.00. PLANNED ENCOUNTERS:** There are situations where deputies have some opportunity to plan prior to an encounter that is reasonably expected to lead to a use of force, such as a cell extraction. When practical and safe to do so, deputies should use this opportunity to attempt to resolve the situation without the need for force. The watch commander (or other supervisor) shall be present to direct deputies in any planned encounter. Unless circumstances dictate otherwise, the following should occur in a planned encounter:

- Reasonable attempts to gain compliance with verbal communication;
- Video recording of the encounter, including any de-escalation attempts, orders or warnings;
- Consultation with medical staff to determine if a particular use of force is not medically advisable;
- Medical staff on-scene or on stand-by during the encounter;
- Use of Crisis Intervention Training and/or consultation with a mental health professional;
- When dealing with an SMI inmate, participation of a mental health professional in trying to get compliance, unless impractical;
- Giving an inmate a reasonable amount of time to calm down and become less agitated (while what constitutes a "reasonable" amount of time may vary under the circumstances, waiting at least 10 minutes is presumed to be reasonable;

when dealing with an SMI inmate refer to section 110.05);

- The use of OC first, if time and circumstances permit unless OC is not medically advisable;
- Waiting a reasonable amount of time between applications of OC to give the OC time to work;
- Consideration of whether or not the purpose of the encounter is important enough to justify a potential use of force (for example, minor medical appointments or court appearances might be able to be rescheduled or delayed, potentially avoiding the need for a cell extraction); and,
- Use of appropriate protective equipment.

Except in an emergency, a cell extraction should not be conducted until at least 10 minutes after the inmate's initial refusal to comply. Refer to the facility Emergency Response Team ("ERT") Manual.

**130.00. USE OF FORCE REPORTING:** The reporting responsibilities for each level of reportable force follow. Note that a supervisor may change the level of a reportable use of force based on updated medical information.

Any use of force that is greater than what is necessary to guide, direct, or assist an inmate is a reportable use of force. The use of the restraint chair, takedowns, control holds/pressure points, OC, pepper ball, Taser ™, less-lethal shotgun or any firearm are always reportable. A reportable use of force can be Level I, Level II, or Level III.

LEVEL I USE OF FORCE: A Level I use of force includes any reportable use of force that does not result in injury, or a complaint of persistent pain, and does not involve the use of a takedown or less-lethal or non-lethal device (OC, pepper ball, Taser ™, or less-lethal shotgun). Every Level I use of force shall be reported to the watch commander via CRM by the primary deputy who engaged in the use of force using the Level I Use of Force form. The report shall be completed prior to going off shift, unless a delay is approved by the watch commander.

LEVEL II USE OF FORCE: A Level II use of force includes any use of force that results in a complaint of persistent pain or any injury other than serious bodily injury or death or, or any use of a takedown, OC, pepper ball, Taser ™, or less-lethal shotgun that does not result in serious bodily injury or death. Any deputy engaging in, or witnessing, a Level II use of force shall submit a detailed written account of the incident on a crime report prior to going off shift, unless a supervisor orders otherwise.

LEVEL III USE OF FORCE: A Level III use of force includes any use of force that results in serious bodily injury or death. Serious bodily injury means any injury causing serious impairment of physical condition and includes, but is not limited to: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. Any deputy engaging in, or witnessing, a use of force the deputy knows or reasonably believes to be a Level III use of force shall submit a detailed written account of the incident on a crime report prior to going off shift, unless a supervisor orders otherwise.

In any instance in which a supervisor has ordered or authorized a deputy to refrain from submitting a written report of a use of force, the authorization and the reason for the authorization shall be documented in the electronic use of force report in CRM.

**130.02. GUIDELINES FOR DOCUMENTING A USE OF FORCE:** The crime report must accurately document, to the best of the deputy's ability, and to the extent applicable:

- Time, date and location of the incident;
- Identity of all participants and witnesses known to the deputy;
- The threat perceived by the deputy;
- The specific type(s) and amount of force used and why that level of force was chosen;
- The inmate's specific actions and statements before and during the incident which created the need for force, and/or changed the level of force required;
- The force used by other deputies to the extent known;
- Any efforts made to avoid or temper the severity of the forceful response;
- The extent of any obvious injuries and/or complaints of pain;
- Whether medical care was offered, and what medical care, if any, was provided;
- Whether any photos, videos, audio recordings or other evidence related to the incident exist and are preserved; and,
- Any other factors or information that have a bearing on the incident.

When explaining the justifications for a use of force, a deputy must only rely on the information the deputy knew at the time the force was used. A deputy shall not use any information the deputy learns after a use of force as a justification for his or her actions. For example, if a deputy did not believe an inmate was armed at the time the deputy used force on the inmate, but the deputy later learned that the inmate had a weapon at the time, it would be a violation of this policy for the deputy to state that

force was used because the inmate was armed. It is never acceptable for one deputy to dictate to another deputy what the justification for force was, or for a deputy to allow another deputy to influence how he or she reports the use of force. A deputy can always document relevant information he or she learns after a use of force, but the deputy must clearly describe how and when that information was learned. For example, "While reviewing the video after the use of force, I saw...." Submitting an intentionally false or misleading report is grounds for discipline, up to and including termination.

**130.03 INJURY NOTIFICATION:** Any time an inmate or deputy is injured as a result of a use of force, the watch commander shall notify the facility commander. In the absence of the facility commander, the executive officer shall be notified. The facility commander or his designee shall notify the Deputy Chief of the Corrections Division whenever a use of force has resulted in the transportation of an inmate or an employee to the hospital due to injuries. Refer to the Department's Duty Captain's Matrix Notification Response.

**130.05. USE OF FORCE REVIEW PROCESS:** All Level I use of force reports shall be reviewed by a supervisor who holds a rank of sergeant or above. All Level II and Level III use of force reports shall be reviewed by a sergeant, a lieutenant, and the facility commander. All Level III use of force reports, and a sample of Level II use of force reports, will also be reviewed by the Use of Force Review Committee. Every use of force will be reviewed to determine if the force used was objectively reasonable and within policy. This review will be:

- Based on the totality of the facts and circumstances known to the deputy at the time the force was used;
- From the perspective of a reasonable deputy on the scene;
- Without the benefit of 20/20 vision of hindsight; and,
- Allowing for the fact that deputies are often forced to make split-second decisions about the amount of force that is necessary in circumstances that are tense, uncertain and rapidly evolving.

In evaluating whether the force used was objectively reasonable, the following additional factors will be considered:

- The relationship between the need for the use of force and the amount of force;
- Any efforts made by the deputy to temper or to limit the amount of force;
- The extent of any injuries;

- The severity of the security problem at issue;
- Whether the inmate was actively resisting or assaultive; and,
- The legitimate governmental interest in managing the facility in which the inmate is detained, and the necessity of maintaining order and institutional security.

If at any stage of review the reviewing supervisor identifies possible criminal conduct or policy violations, the facility commander shall be consulted. Depending on the circumstances, a criminal investigation and/or an administrative investigation may be conducted.

Even when a use of force is objectively reasonable there may still be some potential for improvement by an individual deputy or the Department as a whole. Sometimes, in retrospect, new and better approaches can be identified. Even when a use of force is determined to be within policy, the use of force, and the events leading up to it, should be closely scrutinized. Based on this assessment, supervisors and command staff should develop recommendations for new or revised training, changes or additions to policy, modifications to the facility, or other bureau-wide improvements. The Administrative Support Unit and the Deputy Chief of the Corrections Bureau will review and implement these recommendations whenever appropriate. Any training issues or deficiencies identified during the review process shall be addressed with the involved personnel and any corrective action and/or remedial training documented in accordance with Department policy.

The reporting and review process is depicted in the flow chart attached as Appendix 1.

**130.15. USE OF FORCE REVIEW COMMITTEE:** The Department shall establish a Use of Force Review Committee ("UFRC").

A Deputy Chief shall chair the UFRC, which shall also be comprised of at least two (2) captains, one (1) lieutenant and a representative from County Counsel; all appointed by the Sheriff. In order to provide a Department-wide balance of representation based on training and experience, the Sheriff may appoint additional members to the committee, as necessary. In addition, the Sheriff shall appoint two alternates to serve as a member of the UFRC during the temporary absence of such current member. No officer who directed or participated in a use of force of an incident under review may participate as a member of the UFRC with respect to such incident.

The UFRC shall meet at least once each quarter and review all corrections related Level III use of force incidents and a random sampling from each facility totaling

approximately 10% of Corrections-related Level II use of force incidents per quarter. The random sampling shall be collected by the Civil Liabilities Division and should include use of force incidents which occurred in the preceding three months.

The UFRC shall thoroughly review the facts and circumstances of each use of force incident, including any audio or video recording of the incident, and make recommendations to the appropriate Deputy Chief. In the event that the use of force incident is the subject of an administrative or criminal investigation, the UFRC may defer its review and action pending completion of the other investigation(s).

Recommendations may include but are not limited to the following:

- Use of force was within policy;
- Use of force was within policy with identified training, supervision, policy or equipment issues;
- Use of force was out of policy.

In any instance in which the UFRC identifies policy, supervision or training issues or determines that the use of force is inconsistent with policy, appropriate disciplinary and/or corrective action shall be taken.

**160.00. POLICIES PERTAINING TO SPECIFIC METHODS OF FORCE:** All of the foregoing policies apply to every use of force. The following additional rules apply to the specific methods of force.

**160.05. LESS-LETHAL SHOTGUN:** Only the Department issued shotgun(s) identified by a yellow stock and fore end shall be used with less-lethal rounds. Only qualified Department safety employees who have received and successfully passed Department training on the use of the less-lethal round shall use the less-lethal shotgun.

The expended round shall be collected and submitted with the Level II and or Level III Use of Force report.

Depending on the manner of use and/or the nature of any injuries sustained, the deployment of less-lethal munitions may be investigated as a lethal force encounter. But use of the less-lethal shotgun shall always be reported, whether or not there is contact, and will be documented as a Level II or Level III Use of Force.

**160.10. RUBBER BALL GRENADE USE:** The Stinger Rubber Ball grenade, or "Sting Ball," is available for use by all trained safety personnel within the Department.

Use of the rubber ball grenade shall always be reported, whether or not there is contact, and will be documented as a Level II or Level III Use of Force.

In the event of a failure to detonate, the Department's Arson/Bomb Detail shall be notified for removal. If necessary, the device may be contained in accordance with those current procedures prescribed through training.

**160.15. OLEORESIN CAPSICUM ("OC"):** OC is available for use by all trained safety personnel within the Department. OC can be used to reduce the physical force needed to effectively control combative or violent inmates and to minimize or prevent physical injuries to inmates and deputies. OC should not be used as a replacement for de-escalation techniques.

Generally, deputies shall:

- Give a verbal warning before using OC;
- Limit the number of applications of OC to three (3); and
- Wait a reasonable amount of time, usually at least 30 seconds, between applications of OC to give the OC time to work.

No verbal announcement is required prior to application of OC if making such an announcement would endanger deputies or others, or if an announcement is otherwise impractical.

Deputies shall follow the manufacturer's guidelines related to safe usage. As soon as it is safe to do so, any inmate exposed to OC should be offered clean clothing and an opportunity to wash/decontaminate exposed areas.

Use of the OC shall always be reported, whether or not there is contact, and be documented as a Level II or Level III Use of Force.

**160.20. PEPPER BALL USE:** The pepper ball gun shall be used only by qualified personnel specifically trained in the equipment's use. Because the pepper ball launcher can be used as either a chemical agent delivery system or as an impact weapon, its manner of use will be a factor in determining the objective reasonableness of its use.

Due to the potential for projectiles to inflict injury to the face, eyes, neck and groin, a deputy should avoid intentionally striking those body areas.

Use of the pepper ball shall always be reported, whether or not there is contact, and will be documented as a Level II or Level III Use of Force.

**160.25. THE TASER™:** The term "Taser," as used in this manual, refers to a class of electronic control devices which discharge probes and deliver an electronic charge to an individual for the purpose of controlling violent or potentially violent subjects who pose an immediate threat to Department members, inmates or other members of the public.

Appropriate use of the Taser is intended to help reduce the risk of injury to inmates, Department members, and members of the public. The Taser shall not be used as a means or method of punishment.

A Taser may only be deployed when objective facts indicate that the suspect poses an immediate threat. Generally, the Taser should not be deployed:

- To overcome passive resistance;
- Outside the manufacturer's recommendations;
- Without a verbal announcement of the intended use of the Taser;
- To cause multiple applications or continuous cycling resulting in an exposure longer than 15 seconds (whether continuous or cumulative);
- Without allowing time between applications for the inmate to comply;
- When the inmate is no longer actively resisting;
- When the subject is likely to fall from a precarious position, such as at the top of a staircase, on a ledge;
- When the subject is obviously, or known to be, pregnant;
- With direct and intentional application of the probes or drive stun function to the face, head, neck and groin;
- When the subject is visibly enfeebled due to advanced age or illness; and
- When subjects are handcuffed or otherwise restrained, absent overtly assaultive behavior that cannot be reasonably overcome by any other less intrusive manner.

Corrections Division members who have successfully completed a Department-approved Taser course and have been issued a Taser shall carry the Taser while on duty unless otherwise dictated by assignment. Possession of Tasers in the jail facilities by any other personnel shall not be permitted.

No verbal announcement is required prior to application of the Taser if making such an announcement would endanger deputies or others, or if an announcement is otherwise impractical.

Generally, probes imbedded in a subject's skin shall be removed as soon as practicable, by either trained Department personnel or by licensed medical personnel.

If a probe is embedded in a sensitive area of the body (i.e. eye, lip, neck, breast, or genital area), licensed medical personnel should accomplish the removal, if practicable. In the event of a serious injury, immediate medical aid shall be sought.

Use of the Taser shall always be reported, whether or not there is contact, and will be documented as a Level II or Level III Use of Force.

**170.00. USE OF RESTRAINTS:** Restraint equipment shall be used only as intended by commercial manufacturers and in a manner consistent with training. Restraints shall not be used as a form of discipline, or as a substitute for treatment.

**170.05. RESTRAINT CHAIR:** The restraint chair shall only be used with the approval of a watch commander to temporarily restrain an inmate for a reasonable amount of time. An inmate may not be placed in the restraint chair for longer than two (2) hours without reauthorization by the watch commander. An inmate shall not be placed in the restraint chair for a determinate length of time but rather must be released by a supervisor as soon as the inmate has established that he or she is able to maintain control. If an inmate has not established that he or she is able to maintain control after four (4) hours in a restraint chair, then mental health staff shall be consulted and shall be responsible for directing custody staff to transition the inmate to another setting or modality for the protection of the inmate and staff (for example, a safety cell or clinical restraints). The restraint chair may only be used for the purposes outlined in Bureau Policy Section 4/505.03. Use of the restraint chair on an inmate known to be pregnant is prohibited.

A video recording device and/or video surveillance camera shall be used to record the placement of the inmate in the restraint chair and to continuously record the inmate in the restraint chair until he or she is finally released from the chair.

Medical staff shall assess the condition of an inmate, preferably before placement in the restraint chair, but in all cases within one hour of such placement. Thereafter, a medical staff member shall at a minimum check the inmate's vital signs at least once each hour.

Safety staff shall check inmates in restraint chairs at least twice every 30 minutes. Medical staff and a watch commander shall be present when inmates are removed for hydration and sanitation reasons. Deputies shall attempt to remove restraints at least once an hour to allow inmates to exercise their arms and hands in a range of motion exercise (to prevent circulatory problems). A watch commander and medical staff shall oversee the exercise. All such procedures shall be documented on the

observation log. Safety staff shall explain on the observation log why extremities could not be exercised and a watch commander shall be notified.

Water and toileting shall be offered to restrained inmates on an hourly basis and at mealtimes. Such offers shall be documented on the log. A watch commander and health services personnel shall respond if restrained inmates express a need to use a toilet.

Safety staff shall note on the log if the inmate refuses or the extremities could not be exercised and why.

Immediate appropriate medical attention shall be summoned in the event an inmate's physical or mental health is compromised or deteriorates while restrained. Automated External Defibrillators (AED) shall be available at each facility as required by Bureau Policy Section 4/298.

**170.10.** **SPIT NET:** The "spit net" may be used while moving an inmate when there is a reasonable expectation the inmate may attempt to spit on or bite any person in his/her proximity.

The disposable spit net shall be placed over the inmate's head with the solid material covering the nose and mouth of the inmate. The mask shall be secured by bringing the two end-ties located at the base of the solid material under the armpits and through the loops located on the back of the spit net and tying off in the center of the back.

The spit net shall not be fastened around the inmate's neck. The spit net is not reusable on any other inmate and is not an adequate substitute for the medical mask placed on inmates with contagious disease. The spit mask may, however, be used in conjunction with the medical mask to prevent the inmate from dislodging the medical mask. (Refer to facility specific policy)

**170.20.** **OTHER RESTRAINTS:** Generally inmates shall not remain in restraints while confined in cells. In most cases, restraints shall be removed promptly once the cell door is closed. However, for the safety of inmates and staff, it occasionally may be necessary to place an inmate in a cell while still restrained.

Inmates shall be left restrained only with the approval of a watch commander when less restrictive alternatives would be ineffective in controlling the behavior and when one or more of these conditions apply:

- They display behavior resulting in the destruction of property, or reveal intent to cause physical harm to self;

- Their behavior prevents the removal of restraints or there is a substantial likelihood the removal of restraints would result in a use of force.

Restrained inmates shall be housed alone and shall be subject to the medical and safety observation, review, and logging requirements as well as clothing, water, toileting and exercise requirements described in Bureau Policy Section 4/501.05.

Waist chains shall be the standard device for restraining inmates being transported from or returning to a jail facility and shall only be used as described in Bureau Policy Section 4/502.00

**180.00: TRAINING ON USE OF FORCE POLICY:** Every sworn staff member within the Corrections Bureau shall receive a copy of this policy. Sworn staff members in the Corrections Bureau shall receive at least 6 hours of initial training on this policy. After the initial training, every sworn staff member shall receive refresher training every 2 years to ensure continued knowledge of the Detention and Correction's use of force policies. Such training shall be documented using the Acknowledgment of Use of Force Training form.

# EXHIBIT 1

# SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT
# NON-FATAL USE OF FORCE PROCESS
# FLOWCHART:



# EXHIBIT 2

**X.XXX. RESTRICTIVE HOUSING**

**X00.00. RESTRICTIVE HOUSING DEFINITION:** "Restrictive Housing" shall mean a placement that requires an inmate to be confined to a cell at least 22 hours per day for the safe and secure operation of the facility. (See American Correctional Ass'n, "Restrictive Housing Performance Based Standards," (August 2016), p. 3.)

**X10.00. RESTRICTIVE HOUSING CLASSIFICATIONS:** All inmate classifications referred to as "Restrictive Housing" have been eliminated. Regardless of classification, any inmate not currently on discipline or SMI shall receive twenty-one (21) hours per week of "tier time" and at least the minimum outside recreation time prescribed by 15 Cal. Code Regs. § 1065.

Inmates may receive more tier time than the weekly amounts set forth above when possible between the completion of cleanup of the morning meal and lights out, however the length of tier time may vary based on the number of inmates who will need to utilize the available showers, phones, and kiosks.

In extraordinary circumstances, a supervisor may authorize less tier time than the weekly amounts set forth above to ensure the safety and security of facility, staff, and/or inmates. The scope and duration of the reduction in tier time will extend no further than necessary to address those extraordinary circumstances. When a supervisor authorizes a limitation on tier time, the authorizing shift supervisor shall ensure the date, time, and the reason for the limitation are recorded in the Tier Time Log. The shift supervisor shall initial the log entry and notify the shift watch commander of the tier time limitation before the end of shift. The facility commander must approve any tier time limitation which lasts longer than three (3) days.

The activities in a unit, such as sick calls, accu-checks, clothing exchange, commissary delivery, and disturbances, may, on occasion, interfere with the tier time schedule. Any unintentional or unplanned limitation of tier time which prevents custody staff from meeting the minimums outlined above shall be documented and reported to a supervisor. Custody staff and supervisors shall make reasonable efforts to ensure that the minimums are met.

**X20.00. DISCIPLINARY RESTRICTIVE HOUSING:** The maximum disciplinary sanction will be 30 consecutive days of restrictive housing. Inmates receiving multiple discipline violations arising from a single incident shall be disciplined only for the most serious offense.

Any inmate who is repeatedly returned to disciplinary restrictive housing with no apparent change in behavior or substantial breaks between disciplines will be assessed by a multidisciplinary team which may include the facility Administrative or Operations Sergeant, a representative from the Central Classifications Unit, a representative from the Administrative Support Unit, and a mental health professional. This team will consider alternatives to disciplinary restrictive housing and develop an individualized plan for the inmate. This plan can include any combination of the following:

- Refer the inmate to mental health staff for evaluation, and consultation regarding possible interventions;
- Refer the inmate to the Central Classifications Unit for a classification review, and possible reclassification and relocation of the inmate to a different housing unit;
- Consider imposing only non-restrictive housing disciplinary sanctions for minor violations on a temporary basis, and/or defer all restrictive housing disciplines for a period of approximately five (5) days;
- Review the inmate's past grievances and requests to ensure that there are no outstanding issues or patterns which may be contributing to the inmate's discipline issues; and/or
- Pursue any other individualized approach which may help to address the issue.

**X30.00. RESTRICTIVE HOUSING AND INMATES WITH SERIOUS MENTAL ILLNESS:** If and when Mental Health Services determines that an inmate with a serious mental illness should be housed in some form of clinical segregation to facilitate safe and proper treatment of the inmate, Department correctional staff shall accommodate that housing request, even where the requested clinical segregation would meet the definition of restrictive housing. This clinical segregation shall occur only pursuant to orders of Mental Health Services, and shall continue only for as long as clinically indicated. A Qualified Mental Health Professional shall document that an inmate is to be housed as Seriously Mentally Ill Lockdown ("SMIL") in the inmate's electronic health records, and this shall populate as a "Medical Alert" in the Jail Information Management System (JIMS) accessible to all correctional staff.

**X40.00. RESTRICTIVE HOUSING CONDITIONS, PRIVILEGES, AND PROGRAMMING:** Any cells used for restrictive housing shall meet the minimum standards as dictated by the Board of State and Community Corrections.

The conditions, privileges and programming for inmates with serious mental illness who are segregated from the general population for any non-disciplinary reason shall be overseen by Mental Health Services.

An inmate who is in restrictive housing due to discipline shall not be entitled to the same privileges and programming as other inmates during the term of the discipline.

# EXHIBIT 3

## 18.000. THE AMERICANS WITH DISABILITIES ACT

**000.01. INTRODUCTION TO THE AMERICANS WITH DISABILITIES ACT (ADA):** Broadly defined, the federal Americans with Disabilities Act (ADA) protects the civil rights of people with disabilities. More specifically, Title II of the ADA ensures qualified individuals with a disability an equal opportunity to participate in or benefit from the services, programs, and activities of State and local governments. The ADA applies to jail facilities, inmates and visitors with disabilities. Any deliberate violations of the ADA policy may result in civil litigation and discipline. (Refer to 42 U.S.C. §12132, 28 Code of Federal Regulations Part 35, 2010 ADA Standards for Accessible Design, California Civil Code Sections 54 – 55.57 and County Policy 06-13 Standard Practice).

The intent of this policy is to ensure the Department, Bureau, staff and facilities comply with the ADA, and that inmates with disabilities are not discriminated against and have reasonable accommodations, consistent with their classification level, for the same access to jail facility programs, activities, and services as non-disabled inmates. Staff shall ensure inmates with disabilities are afforded equal opportunity to participate in activities, programs, and services provided by the jail facilities. Staff with questions regarding this policy may contact their Facility ADA Coordinator or the Administrative Support Unit. (Rev. 03/2018)

**005.00. DEFINITIONS:**

Disability: A physical or mental impairment that substantially limits one or more major life activities; being perceived as having a disability; or having a history of a disability. These include, but are not limited to, any disability that would substantially limit the mobility of an individual or an impairment of vision and/or hearing, speaking or performing manual tasks that require some level of dexterity. Additionally, disability includes a physical or mental impairment that would inhibit a person's ability to meet the rules and regulations of the facility.

Major Life Activities: Activities which include, but are not limited to, caring for one's self, performing manual tasks such as walking, seeing, hearing, speaking, breathing, learning, and working.

Effective Communication: Written, spoken, or other means of communication that is clear and understandable for those with or without a disability.

Intellectual Disability: Is characterized by significant limitations and intellectual functioning (such as learning, reasoning, and problem-solving) and in adaptive behavior (conceptual skills such as language, literacy, money, time, and self-direction; social and

interpersonal skills; and practical skills such as personal care and schedules/routines). This includes people for whom the onset of the disability occurs before age 18 (developmentally disabilities) and people for whom events later in life resulted in some of the limitations (for example: head injury, stroke, or dementia).

Physical Impairment: Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.

Sign Language Interpreter: A qualified sign language interpreter is an individual, available on-site or through a video remote interpreting service, who is adept at American Sign Language (ASL) and has passed a test and qualified in one of the categories established by the National Association for the Deaf (NAD) or one of the categories established by the Registry of Interpreters for the Deaf (RID).

(Refer to 28 CFR Sections 35.104 and 35.150, California Civil Code Sections 54 to 55.3, and Penal Code Sections 365.5 to 365.7).
(Rev. 03/2018)

**010.00 ADA AND THE CALIFORNIA CODE OF REGULATIONS, TITLE 15:** The Minimum Standards for Local Detention Facilities, California Code of Federal Regulations, Title 15, standards and services shall apply to inmates with disabilities the same as all other inmates.
(Rev. 03/2018)

**015.00. ADA AND THE PRISON RAPE ELIMINATION ACT (PREA):** The Prison Rape Elimination Act, 42 U.S.C. Section 1601 et seq., ("PREA"), was enacted to prevent, detect, and respond to sexual abuse in confinement settings. Each facility shall ensure inmates with disabilities (including, for example, inmates who are deaf or hard of hearing, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities) have an equal opportunity to participate in or benefit from all aspects of the Department's efforts to prevent, detect, and respond to sexual abuse and sexual harassment in the jail facilities. This information is contained in the Inmate Orientation Video, Inmate Rules and Regulations pamphlet, and Inmates with Disabilities pamphlet.

**18.000. THE AMERICANS WITH DISABILITIES ACT**

Staff shall ensure reasonable steps are taken to provide access to all aspects of the Department's efforts to prevent, detect, and respond to sexual abuse and sexual harassment of inmates with disabilities who require reasonable accommodations to ensure effective communication.
(Refer to the Prison Rape Elimination Act Section 115.16 and 28 CFR Section 35.104).
(Rev. 03/2018)

**020.00 ADA COMPLIANCE COORDINATORS:** In order to ensure ADA compliance, the following shall be designated as ADA Coordinators:

- Health Services Administrator (HSA): Detention and Corrections Bureau
- Administrative Support Unit (ASU) Lieutenant or Sergeant: Detention and Corrections Bureau
- Facility Administrative Sergeant

The ADA Coordinators, or their designee(s), shall be responsible for ensuring overall ADA policy compliance, coordinating ADA training, reviewing and tracking ADA grievances, responding to requests for accommodation, and providing additional ADA related assistance, and support to facility staff to address any facility issues related to ADA.

The Health Services Administrator, or their designee(s), shall be responsible for providing updated training to other ADA Coordinators.
(Rev. 03/2018)

**025.00 ADA EMPLOYEE TRAINING:** All new employees assigned to the Detention and Corrections Bureau shall attend Department provided training on the ADA and this policy. New employee training shall be provided during the Jail Operations course, the Introductions to Corrections course and the Introduction to Management and Jail Supervision course. Current employees assigned to the Detention and Corrections Bureau at the time this policy goes into effect shall attend Department-provided training on the ADA and this policy. Facility Commanders shall ensure current employees attend the training. The training shall be provided by ADA instructors with appropriate training and subject matter expertise.
(Rev. 03/2018)

**030.00 TRACKING INMATES WITH DISABILITIES:** Health Services staff shall utilize special needs "Flags" to document the inmate's diagnosis, disability or other special needs in the Electronic Health Records (EHR). This information will populate the "Medical Alert" section of JIMSnet accessible to all correctional staff. It shall be consulted prior to

the placement, transfer, or transportation of disabled inmates. Special needs flags shall include the assessment and the identified needs and accommodations.
(Rev. 03/2018)

**035.00 IDENTIFICATION OF INMATES WITH DISABILITIES:** Inmates with disabilities shall be assigned a colored wrist band by Health Services staff, allowing staff to visually identify from a distance that an inmate may be, due to a physical or mental impairment, slow or unable to respond to commands. Health Services staff shall write the inmate's booking number on the wristband.

The following colors shall indicate the following disabilities:

- Red: Visual impairment
- White: Hearing impairment
- Blue: Physical impairment possibly requiring a mobility device
- Grey: Intellectual disability
- Yellow: Medical diagnosis including: Pregnant, Seizures, Diabetes, Cardiac and other clinical considerations as listed in the "Medical Alert" section of JIMSnet accessible to all correctional staff.

The purpose of this is to alert staff that the inmate may need reasonable accommodation to follow directions, understand what staff is communicating, or need specific types of assistance. If the bands are damaged the housing deputy shall ensure the inmate obtains a replacement from Health Services staff.

Staff can reference additional ADA information via JIMSnet under the "medical" tab.

Inmates may refuse to accept the wristband with or without listed diagnoses and/or disability. Health Services staff shall provide the inmate an informed refusal form and document the refusal within the inmate's health record.

If a staff member discovers an inmate who is suspected of having a disability or adaptive difficulties not indicated by a wristband, staff should refer to the "Medical" tab in JIMSnet for relevant information. If the information is not documented in JIMSnet, the staff member shall immediately refer the inmate back to Health Services staff for assessment. Difficulties may include adaptive functioning, intellectual or developmental disabilities, personal hygiene or self-cleanliness. Staff shall familiarize themselves with the adaptive needs as indicated on the wristband of those inmates.
(Refer to Bureau Policy Section 9.310.01).
(Rev. 03/2018)

## 18.000. THE AMERICANS WITH DISABILITIES ACT

**035.01 THE ADA INTAKE AND VERIFICATION PROCESS:** Health Services staff shall make the initial assessment to identify potential disabilities through self-identification, documentation already present in the health records, staff observation, or the request of a third party (such as an arresting officer or family member) for an evaluation, and document the findings using the Electronic Health Record (EHR) system.

Health Services staff shall identify and document the preferred method of communication, mobility concerns, potential adaptive issues and cognitive deficits. Any identified issue will appear on the inmate's JIMSnet screen as a "Medical Alert". If issues are identified during the intake/booking process which require additional assessment, such assessment shall take place within 14-days. Health Services staff shall ensure that any appropriate reasonable interim accommodation (such as a wheelchair, walker, or tapping cane) shall be provided pending further assessment.
(Rev. 03/2018)

**035.05 ADA BOOKING RESPONSIBILITIES:** Once an inmate with a disability is identified as needing an accommodation, the inmate's booking process shall be completed as soon as possible. The booking process shall be considered complete when the inmate is either released from custody or arrives at their housing location. Exceptions to this are if computer systems are down, inmate identification is not verified, the inmate is too intoxicated to be released, the inmate is transported to a hospital, or a significant facility emergency arises.

Inmates identified as having a health condition, disability or special need shall be expedited through the booking process, as clinically indicated and with safety/security consideration. The deputy shall ensure through effective communication that the inmate is aware of all available programs and services and provide the inmate with an Inmates with Disabilities Information Brochure (ASU #110612). A staff member or, if reasonably available, an interpreter shall read and explain the pamphlet to the inmate if an inmate has difficulty reading/understanding the ADA brochure. The inmate shall sign a second copy of the pamphlet indicating it was read to them and they received a copy. The signed copy will be placed in the inmate's booking jacket.
(Rev. 03/2018)

**040.00 ADA HOUSING AND CLASSIFICATION:** Inmates with disabilities shall be housed based on their classification as determined by the current classification criteria. Inmates with disabilities shall not be housed in more restrictive settings based solely on the fact they are disabled.

## 18.000. THE AMERICANS WITH DISABILITIES ACT

Disability needs identified by Health Services staff including specialized housing, lower tier/lower bunk, ADA cell, no stairs or slopes in the path of travel, assistive devices, effective communication, etc. shall be documented in the inmate's Electronic Health Record (EHR) and on the designated Special Housing/Medical Recommendation form (ASU #060401) provided to Classification staff for implementation.

Classification staff shall reasonably accommodate the identified special needs documented on the Special Housing/Medical Recommendation form as applicable for any placement or transfer.

During the "Voice Enrollment Guide" for the phone system, Classification staff shall assess the inmate's ability to comprehend instructions, ability to read and demonstrate their understanding of, complex sentences, and to successfully complete the phone voice enrollment. Classification staff shall document on the designated form whether the inmate demonstrated effective communication during the process, or demonstrated a need for assistance. If additional assistance is identified, a written referral to health services staff shall be completed. Health Services staff shall schedule and evaluate all inmates with identified assistance needs and document their findings in the inmate's health record.
(Refer to Bureau Policy Sections 9.800.00 and 9.900.00).
(Rev. 03/2018)

**040.05 ADA HEALTH SERVICES AND CUSTODY FOLLOW-UP:** Health Services along with custody staff shall monitor inmates with an intellectual or developmental disability needing adaptive functioning support with, but not limited to, personal hygiene and cell cleanliness, and reading and writing help on a daily basis. The method and frequency of the monitoring required by this section may vary based on the circumstances, but must be sufficient to ensure that the necessary adaptive functioning support is provided. A qualified health professional or qualified mental health professional may order monthly contacts with an inmate when appropriate, and these contacts will be documented in the inmate's electronic health record.

If a staff member believes an inmate has a disability or adaptive issues, not indicated by a wristband, staff should refer to the "Medical" tab in JIMSnet for relevant information. If the information is not documented in JIMSnet, the staff member shall immediately refer the inmate back to Health Services staff for assessment. Difficulties may include adaptive functioning, intellectual or developmental disabilities, personal hygiene or self-cleanliness. All inmates identified as having a disability shall have a follow-up assessment conducted by Classification staff no less than 30 days from their last assessment. More frequent

follow-up contact may be necessary and shall be conducted as directed by Health Services and/or an ADA Coordinator.

Staff shall conduct follow-up meetings with identified intellectually disabled inmates on a weekly basis, within a private setting, to ensure no victimization is occurring.
(Add. 03/2018)

**041.00 SIGN LANGUAGE INTERPRETERS:** The Department shall provide a sign language interpreter to ensure effective communication during:

- Classification follow-up interviews
- Disciplinary hearings and related processes
- Clinical encounters which include the following:
  - Determination of medical history or description of ailment or injury;
  - Diagnosis or prognosis;
  - Medical care and medical evaluations;
  - Provision of mental health evaluations, rounds, group and individual therapy, counseling and other therapeutic activities;
  - Provision of the patient's rights, informed consent, or permission for treatment;
  - Explanation of medications, procedures, treatment, treatment options, or surgery;
  - Discharge instructions.

  (Note: this requirement does not apply to patient contacts related only to ongoing established treatments, blood sugar testing, vital signs, medication delivery, or similar.)

If the use of an interpreter is waived by the inmate such waiver shall be noted in the related document(s).

In addition, interpreters may be requested for a number of different complex communications, including, but not limited to:

- Administrative and criminal investigations
- Interviews
- Religious Services

Prior to requesting a sign language interpreter, reasonable efforts shall be made to communicate with an inmate with a disability. If a staff member determines that a sign

language interpreter is necessary for effective communication, the staff member shall request an interpreter. The complexity and importance of the communication, the number of people involved, the length of the communication, and the inmate's lack of reading/writing skills and comprehension are factors to consider when deciding whether to summon an interpreter.

In cases where the use of a sign language interpreter is not possible due to a safety or security risk, or is waived by the inmate, staff shall employ the most effective form of communication available.

Lip reading will not be the sole method of effective communication utilized by staff. Staff shall not rely on inmate interpreters, inmate readers, or other types of inmate assistants except in limited circumstances where an extended delay in obtaining a qualified interpreter could compromise the inmate's safety, the performance of first response duties or the investigation of the inmate's allegations. Qualified interpreters can interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued language transliterators.

Staff can request a sign language interpreter by submitting a Request for Translation and Interpretation Services Form found on the Department's Starlink Intranet page, under the "Detention and Corrections" tab.

The Department shall maintain a contract or service agreement with interpreter services in order to provide such services for deaf or hearing-impaired people in custody. Jail staff will be informed of the availability of contract interpreter services.

(Rev. 03/2018)

**045.00 ACCESS TO HEALTH SERVICES:** Inmates with disabilities shall not be denied access to Health Services based on their disability. The Department shall help inmates whose disabilities make them unable to complete necessary paperwork related to health care on their own.
(Rev. 03/2018)

**045.01 WHEELCHAIRS AND MEDICAL APPLIANCES:** Inmates using medical appliances such as a wheelchair, walker, crutches, or a cane, due to mobility impairment,

shall be evaluated by Health Services staff during the intake Receiving Screening to determine the necessity of the medical appliance.

The facility commander shall consider the opinion of Health Services staff, as well as the possible threat to the security of the facility, and the possible risk of bodily harm to inmates and staff, in determining if the inmate will be permitted to keep their personal wheelchair or medical appliance.

An assistive device shall not be taken from the person to whom it was issued without either:

- An individualized assessment by Health Services that the device is neither medically necessary nor a reasonable accommodation for program access; or
- An individualized determination that allowing the device constitutes a risk of bodily harm or threatens the security of the facility.

If custody staff determine it is necessary to remove an assistive device (personal or jail-issued) for security reasons, the department shall provide an alternative jail-issued device unless custody staff, with supervisory review, determine and document in the inmate's health record, based on an individualized assessment, that the alternative device constitutes a risk of bodily harm or threatens the security of the facility.

If such a determination is made, the ADA coordinator or supervisory-level designee shall document the decision and reasons for it and shall consult with Health Services to determine an appropriate alternative accommodation.

If the inmate's personally-owned wheelchair or medical appliance is confiscated, it shall be placed with the inmate's property and appropriate Health Services approved wheelchair or medical appliance shall be immediately provided for the inmate.

Safety staff shall search any wheel chair or other mobility appliance prior to it being issued to the inmate or allowing the inmate to keep a personal device.

The Department will ensure that any personal device belonging to the inmate is returned to the inmate prior to his/her release from custody. Before inmates with mobility issues are released, the Department shall make appropriate arrangements to ensure that the inmates have or will have access to either medically necessary assistive devices or other appropriate assistance.
(Rev. 03/2018)

**18.000. THE AMERICANS WITH DISABILITIES ACT**

**045.02 MOBILITY DEVICE MEDICAL RECOMMENDATION FORM:** Inmates with disabilities must keep the Medical Recommendation Form for their assigned mobility device on their person. Inmates in possession of a mobility device without a copy of the Medical Recommendation Form are subject to discipline.
(Rev. 03/2018)

**045.03 MOBILITY ASSISTANCE:** Staff shall provide reasonable assistance to inmates with mobility and vision impairments. Examples include, but are not limited to, providing inmates extra time to move from place to place, providing a wheel chair, and escorting blind inmates to and from visiting, medical appointments or other programs. Staff shall not require another inmate to provide assistance to a disabled inmate, however a disabled inmate may request the help of other inmates if the inmate prefers and assistance from the other inmate is consistent with safety and security.
(Rev. 03/2018)

**045.04 EMERGENCY SAFETY PROCEDURES:** Staff shall ensure appropriate assistance is provided to inmates with mobility disabilities who are unable to sit or lie down during an alarm or emergency and people with hearing disabilities who may not be able to hear an alarm or orders to stop moving. Staff shall be able to access information about people in custody with disabilities that may require accommodations during an alarm or emergency. Inmates who cannot sit or lie down because of their disabilities, or who cannot hear an alarm or orders to stop moving, shall not be disciplined for failure to do so during an alarm or emergency unless they were provided the necessary help and refused to comply.

The Department shall continue to maintain visual alarms for deaf or hard of hearing people, and large print notices for emergency and fire exit routes posted in all units.
(Add. 03/2018)

**050.00 EFFECTIVE COMMUNICATION WITH INMATES WITH DISABILITIES:** Communication with inmates with disabilities must be as effective as communications with others. It is incumbent upon staff to use good judgment when dealing with inmates with disabilities. Staff should understand inmates with disabilities may not react as quickly, see, hear, or move the same way as inmates without disabilities. Staff shall assist inmates with reading notices, inmate rules, commissary lists and other written information, upon request.

If a staff member has difficulty communicating with a disabled inmate, the staff member shall refer to JIMSnet, under the "Medical Alert" section to identify the inmate's preferred

method of communication. If the preferred method is unavailable or otherwise unsuccessful, staff can utilize other methods until such communication is effective. The effort and method used to communicate, including whether and to what extent it was effective, shall be documented on an ADA Inmate Communication form (ASU#****) and filed in the inmate's booking jacket.

The Department shall ensure that pre-approved auxiliary aids and services are provided as appropriate to ensure effective communication when simple written or oral communication is not effective. The type of auxiliary aid or service deemed necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. Where necessary to afford individuals with disabilities the benefits of, a service, program, or activity, the Department shall give primary consideration to these requests of individuals with disabilities.

In determining what auxiliary aid service to provide, the Department shall give primary consideration to the request of person with a disability. The preferred mode of communication for people with hearing impairments shall be entered into the "Medical Alert" section in JIMSnet.
(Rev. 03/2018)

**050.01 UNMODIFIED CELLS AND EXIGENT CIRCUMSTANCES:** When deemed necessary for the safety and security of the inmate, the staff, or the public, an inmate with a disability may be placed in a cell not modified for accessibility. Any such placement shall be done for no longer than necessary to address the exigent safety concerns and only for the purpose of protecting the welfare and safety of the inmate or other persons.

Exigent circumstances may include, but are not limited to, such instances as earthquakes, fires, inmate riots, criminal investigations, etc.

If available, staff shall try to temporarily place the disabled inmate in the medical unit of the facility.
(Rev. 03/2018)

**050.02 FACILITY MAINTENANCE DEFICIENCIES:** All jail facilities shall ensure the physical plant is in compliance with ADA requirements and shall house inmates with disabilities with appropriate accommodations.

Generally, facility maintenance requests for ADA-related repairs shall take priority over other requests. A facility maintenance request that is not for ADA-related repairs can take priority when necessary to ensure the safety and/or security of the facility or to address a significant adverse impact on jail operations.

Centralized Classification Unit (CCU) shall be immediately notified of deficiencies in ADA housing and/or inmates with disabilities requiring a housing transfer.
(Add. 03/2018)

**050.03 ACCESS TO RESOURCES:** Inmates with disabilities shall be provided equal access to phones, visits, official visits, mail, and legal mail in accordance with Bureau Policy. Facilities and staff shall make reasonable accommodations to ensure disabled inmates have access to these programs.

The inmate rules and regulations brochure will identify and list available resources for inmates with disabilities.
(Rev. 03/2018)

**050.04 TTY AND TELEPHONE ACCESS FOR INMATES WHO ARE DEAF OR HARD OF HEARING OR HAVE SPEECH DISABILITIES:** Staff shall provide inmates who have hearing impairments or speech disabilities access to a TTY phone at the time of booking and while housed in a detention facility. Booking facilities not equipped with TTY phones shall arrange transfer of inmates with hearing impairments or speech disabilities to an adequately equipped facility.

Staff shall:

- Ensure the TTY device is activated
- Assist the inmate in placing the call if needed
- Ensure TTY device is in proper order after use

Inmates with hearing impairments or speech disabilities shall be provided with an additional amount of time to use the TTY phone to account for the fact that signed and typed conversations take longer than spoken conversations.
(Refer to ADA Title II Regulation 28 CFR Section 35.104 and 42 USC, Section 12131.
(Rev. 03/2018)

**050.05 TTY OPERATION:** Staff shall be familiar with the TTY use and shall ensure its operability at all times.
(Refer to Facility Specific Policy).

## 18.000. THE AMERICANS WITH DISABILITIES ACT

(Rev. 03/2018)

**050.06 INMATES WITH DISABILITIES AND ACCESS TO TTY DEVICES:** Inmates wishing to use TTY phones to call deaf or hearing-impaired friends or family can submit request slips to staff. Such requests shall be accommodated as soon as practical. Staff shall note date and time of inmates' TTY calls on the request slips. Completed requests signed by staff, including employee number, shall be filed in the inmate's booking jacket and/or electronically filed via the automated request system kiosk.
(Refer to Bureau Policy Section 12.305.00).
(Rev. 03/2018)

**050.07 ACCESSIBLE HOUSING ASSIGNMENTS:** Facilities shall identify cells for use by inmates with accessibility needs. Inmates with visual and mobility disabilities shall be assigned to a bottom tier cell and bottom bunk. Inmates with disabilities should not be assigned to a medical or mental health unit unless that inmate has a specific medical or mental health issue requiring special housing. This policy recognizes that other classification and population management factors may require special housing under certain circumstances.

The Centralized Classification Unit (CCU), in consultation with the ADA Coordinator at each facility, shall keep a list of accessible placements and periodically review to ensure that inmates with disabilities are housed accessibly in accordance with their designated accommodations.
(Rev. 03/2018)

**055.00 ADA ACCOMODATIONS IN HOUSING UNITS:** Inmates with disabilities shall not be denied any programs, activities, or opportunities provided to other inmates solely by reason of their disabilities.
(Refer to Bureau Policy Section 11.215.00).
(Rev. 03/2018)

**060.00 POSTING ADA COMPLIANT INFORMATIONAL NOTICES:** The Department shall develop an ADA notice. The ADA notice will be prominently posted in all housing units, in the booking/intake areas, in the medical/mental health and dental treatment areas, and at the public entrances of all jail facilities.

Information notices directed at inmates shall be posted at a level that is accessible to inmates in wheelchairs. Staff shall assist inmates with reading notices, inmate rules, commissary lists and other written information, upon request.

**18.000. THE AMERICANS WITH DISABILITIES ACT**

(Rev. 03/2018)

**062.01 CLOSED CAPTION TELEVISIONS:** Facility housing unit televisions should have the "Closed Captioning" feature turned on at all times.
(Refer to Bureau Policy Section 12.1340.00).
(Rev. 03/2018)

**062.02 INMATES WITH DISABILITIES AND PROGRAMS:**
(Deleted and moved to section 18.065.00).

**062.03 INMATES WITH DISABILITIES AND COURT TRANSPORTATION:**
Inmates with disabilities scheduled for court shall be prepared and staged in their housing areas and transported directly to awaiting court transportation vehicles. They shall not be required to wait in Transportation areas. Transportation to court shall be consistent with their classification level.

Inmates shall be secured in leg restraints, waist chains or handcuffs except in cases where health services staff has indicated in writing that an inmate has an identified medical condition that would be potentially worsened by the use of leg restraints, waist chains or handcuffs.

Prescribed health care appliances, assistive devices, and durable medical equipment, including canes, shall be available to disabled inmates at all times except while being transported in a vehicle.

Inmates identified by Health Services staff as having mobility issues and those assigned to a bottom tier cell and bottom bunk shall not be required to the climb steps of a transport vehicle. Use of a vehicle equipped for mobility impaired inmates, such as a wheelchair van, is an acceptable mode of transportation. Health Services staff shall identify these inmates by issuing a yellow wristband and documenting the transport request in JIMSnet as a "Medical Alert".

Transportation lists shall indicate necessary accommodations and shall be reviewed prior to any scheduled transportation to ensure that accommodations are planned for and provided.
(Rev. 03/2018)

**065.00 ADA INMATE SERVICES PROGRAMS AND WORK RELEASE:** Inmates with disabilities are entitled to participate in Inmate Services Programs if they meet all

eligibility and participation criteria. Inmates with disabilities are bound by the same prerequisites, rules, and regulations as all other participating inmates. Inmate Services Unit (ISU) shall maintain procedures that ensure inmates with disabilities have access to programs.

Inmates with disabilities are entitled to and shall be provided an equal opportunity to participate in and benefit from the same categories of programs as all other inmates. These categories include:

- Court ordered programs
- Educational Programs
- Substance Abuse Programs
- Tier Time and Outside Recreation
- Religious Services
- Work Assignments/ Vocational Training
- Work Release
- Re-entry Programs
- Access to library reading materials

Inmates with disabilities shall not be denied access to a category of programs based on their disability. They shall have access in a manner consistent with their classification level.

Eligibility requirements for all educational programs shall not exclude a person because of a disability (such as reading level for a person with a learning or intellectual disability or daily schedule for a person on dialysis). Education program providers at the Jails will ensure effective communication for people with disabilities participating in their programs. The Department shall provide reasonable accommodations to students who have special needs, such as those with developmental, learning, vision, hearing, and speech disabilities.

Inmates with disabilities who can perform the essential functions of a particular inmate worker job will not be excluded from that job solely because of their disability. Health Services shall conduct an individualized assessment to identify physical limitations to prevent improper exclusions from work opportunities. The Department will provide reasonable accommodations to enable people with disabilities to participate in work opportunities.

**18.000. THE AMERICANS WITH DISABILITIES ACT**

People with intellectual disabilities assigned to a job or educational or rehabilitation program will be provided additional supervision and help as necessary to allow them to meet the requirements of the assignment.

Qualified inmates regardless of disabilities are entitled to participate in Work Release and are bound by the same rules and regulations as all other participating inmates. Work Release shall maintain procedures that ensure inmates with disabilities have access to Work Release programs.
(Refer to ADA Title II Regulation 28 CFR 35.130).
(Rev. 03/2018)

**066.00 INMATES WITH DISABILITIES AND GRIEVANCES:** An inmate with a disability who believes he/she is the subject of disability discrimination or who has any other concern shall use the grievance procedure described in the Bureau Policy Section 12.200.00. Grievance forms shall be available to inmates either electronically via the automated kiosk located in the housing area or by request of an Inmate Grievance form (ASU#050401) if the kiosk system is down or unavailable. The ADA inmate can select the "ADA" button on the automated kiosk to submit their issue to the ADA Coordinator at the facility.

The facility coordinator, or designee, shall be responsible for addressing disability related grievances.

Inmates with a visual impairment or intellectual disability or who are unable to read or use the grievance system independently due to a learning or other disability can receive assistance from staff to complete the forms or receive instruction on how to use the kiosk.

Staff shall make reasonable efforts to ensure all people in custody are aware of the disability grievance procedures, including the availability of accommodations (such as screen enlargement) and staff assistance to submit a grievance.

Inmates whose disabilities impact their ability to read or communicate shall be interviewed as part of the grievance process when needed to ensure meaningful access and effective communication.

The Department shall expedite a response to an identified urgent disability grievance (for example, those that involve safety or physical well-being) and provide appropriate interim accommodations pending review of the grievance.

**18.000. THE AMERICANS WITH DISABILITIES ACT**

Inmate grievance logs shall be maintained at each facility according to Bureau Policy Section 12.252.00. The log shall be distributed to the Administrative Support Unit (ASU) monthly. ASU will periodically review disability grievances and responses for quality assurance purposes by the ADA Coordinators.

Logs shall contain:

- Inmate grievance number
- Date grievance received
- Inmate's name and booking number
- Type of grievance submitted (ADA)
- Grievance issue
- Staff member grievance assigned
- Date grievance assigned
- Date completed grievance is due
- Date inmate received the answered grievance
- Involved employee

(Rev. 03/2018)

**067.00 INMATES WITH DISABILITIES AND DISCIPLINE:** Inmates with disabilities are required to follow the same rules and regulations as other inmates and are subject to the same disciplinary process as other inmates. Inmates with disabilities shall not be subject to discipline because of their disability.

Under no circumstances shall an inmate with disabilities be denied work time credits solely due to their disability. Sentenced inmates with a disability that prevents them from having a work assignment shall lose good and work time credits only for violations of inmate rules and regulations.

Staff shall not deny an inmate with a disability an assigned mobility device as a form of discipline. If the mobility device is seized as evidence of a crime, a replacement device shall be provided unless the device was used as a weapon. In those cases, the inmate shall be referred back to Health Services and Classification staff for reassessment.

Any inmate without disabilities who is found to be in possession of any mobility device, clothing, library material, or other disability related equipment or items issued to an inmate with a disability is subject to discipline for possessing contraband.

No inmate shall be disciplined based solely on the actions of another (for example: having their cane confiscated without replacement because of its use as a weapon by another inmate).

When inmates with mental illness or intellectual disabilities are given disciplinary write-ups, mental health clinicians shall have an opportunity to provide guidance as to whether the behavior was due to or strongly influenced by the mental illness or the intellectual disability, or whether any sanctions should be mitigated by the mental illness or intellectual disability. The guidance shall be reviewed and considered by the disciplinary decision-maker.
(Rev. 03/2018)

**068.00 INMATES WITH DISABILITIES AND VISITS:** Inmates with disabilities shall not be denied religious, attorney, official or regular visits based on their disability. Inmates with disabilities shall have visiting access consistent with their classification level. (Refer to Facility Specific Policy and Bureau Policy Sections 12.1700.00, 12.1897.00, 12.1900.00 and 12.2000.00).
(Rev. 03/2018)

**069.00 VISITORS WITH SERVICE ANIMALS:**
Service Animals: Any dog or miniature horse that is individually trained to do work or perform tasks for the benefit of an individual with a disability. A service animal is not required to be specially licensed as a service animal, or certified as such by a state or local government. Service animals are not pets. A miniature horse is approximately 24" to 34" from the floor to the shoulder and 70 to 100 pounds.

Visitors entering a facility accompanied by a dog or a miniature horse the visitor claims is a service animal shall be admitted. A visitor claiming the need for the service animal shall not be asked about their disability nor be required to provide proof of disability. The visitor shall not be required to verify the animal's capability as a service animal.

When a visitor with an animal attempts to enter a facility, staff should:

- Ask if the animal is required because of a disability and what work or task the animal has been trained to perform
- If the person states the animal is a pet, the animal shall be denied entrance to the facility
- If the animal growls, or otherwise acts in a manner that poses a direct threat to the health and safety of others, it shall not be allowed into the facility

Barking alone is not a reason to direct the person and service animal to leave the facility. Some service dogs are trained to bark to alert its owner of an onset of a medical condition

such as a seizure. Staff should speak to the owner and summon medical assistance if necessary.

A service animal shall have a harness, leash, or other tether, unless either the handler is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which case the service animal must be otherwise under the handler's control (*e.g.*, voice control, signals, or other effective means).

Individuals with disabilities shall be permitted to be accompanied by their service animals in all areas of a facility where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go.

Facilities shall not ask or require an individual with a disability to pay a surcharge or to comply with other requirements generally not applicable to people without service animals.
(Refer to Bureau Policy Section 18.000.05 and ADA Title II Regulation 28 CFR Part 35).
(Rev. 03/2018)

**075.00 SEARCHING SERVICE ANIMALS:** Animals with harnesses, packs, or any other coverings are subject to search. Any person who refuses to allow an animal to be searched for any reason shall not be provided access to the facility.
(Rev. 03/2018)

**080.00 SERVICE ANIMAL DISTURBANCES:** If staff are called to a disturbance involving an animal that initially appeared to be passive and under control of the handler, but subsequently begins displaying aggressive behavior, the visitor shall be ordered to remove the animal from the facility due to its aggressive behavior.

If the visitor is ordered to remove the animal from the facility, the visitor shall be allowed to arrange proper care for the animal and return to the facility and complete their visit without the animal.
(Refer to ADA Title II Regulation 28 CFR Section 35.136).
(Rev. 03/2018)

**082.00 REMOVING A SERVICE ANIMAL FROM A FACILITY:** When staff denies entry to an individual bringing an animal into a facility, or if the visitor is ordered to remove the animal after having been admitted, staff shall immediately notify the shift

supervisor and prepare an interoffice memorandum for the shift supervisor. The memorandum shall include the following information:

- The name, date of birth, address, telephone number, and any other identifying visitor information of the person with the animal
- A description of the involved animal
- A description of the specific behavior on which staff based their decision to exclude, or order the removal of, an animal from the facility
- A description of the steps staff took to accommodate the disabled visitor and the visitor's response to those steps.

(Rev. 03/2018)

**085.00 SERVICE ANIMAL CARE:** Staff shall not accept responsibility for watching, feeding, watering, or otherwise caring for any service animal. In the event the owner is arrested or otherwise unable to care for the animal, staff shall ask the owner who the animal should be released to and attempt to contact that person. If nobody can be located or pick up the animal in a reasonable amount of time, staff shall contact the local animal control service.
(Rev. 03/2018)

**087.00 SERVICE ANIMALS AND FACILITY SECURITY AND SAFETY:** Nothing in this policy shall discourage staff from taking appropriate steps to ensure the safety and security of the facilities, other staff, visitors, and inmates. Allergies and fear of animals are not valid reasons for denying or refusing service animals entrance onto a facility.
(Refer to Bureau Policy Section 12.1700.00).
(Rev. 03/2018)

**090.00 ACCEPTING ARRESTEES' SERVICE ANIMALS:** Service animals shall not be accepted from arresting agencies. Arrestees' animals are the responsibility of the arresting agency and facilities shall not take responsibility for arrestees' animals whether or not they are service animals.
(Rev. 03/2018)

**095.00. INMATES WITH DISABILITIES AND RELEASES:** Inmates with disabilities being released shall be guided through the process by a deputy if assistance is needed. The housing and/or release deputy shall provide assistance as needed for an inmate with disabilities until the inmate is beyond the secure area of the facility.
(Rev. 03/2018)

# EXHIBIT B

**TOPETE v. COUNTY OF SAN BERNARDINO**

**DUTIES OF RULE 706 EXPERTS**

Pursuant to Rule 706(b) of the Federal Rules of Evidence, the parties set forth the duties of Todd Wilcox, M.D., Roberta Stellman, M.D., and Jeffrey Schwartz, Ph.D. and Gary Raney.

1. The Court experts shall advise the parties and the Court on the County's compliance or non-compliance with the medical care (Dr. Wilcox), mental health care (Dr. Stellman) and use of force provisions (Dr. Schwartz and Mr. Raney), of the Remedial Plan, to assist with dispute resolution matters and to provide testimony, if required, in any proceedings before the Court.

2. Within 180 days after entry of this Consent Decree, and then every 180 days thereafter during the term of this Consent Decree, the Court experts shall each complete comprehensive reviews and reports ("180-Day Reports") to advise the parties and the Court on Defendant's compliance or non-compliance with the Remedial Plan.

3. In each 180-Day Report the experts shall state their opinion as to whether Defendant is or is not in substantial compliance with each material component of the Remedial Plan within the expert's area of expertise. These opinions are referred to in the Consent Decree as "Substantial Compliance Determinations." The 180-Day Reports shall be considered separate and apart from any evaluations and reports prepared as part of the dispute resolution process set forth in the Consent Decree and shall be admissible in evidence in any proceedings before the Court.

4. The Court experts shall be entitled to reasonable expenses incurred plus the following hourly and/or daily rates, which shall be paid by Defendant: Dr. Wilcox: $3,600 per day for onsite monitoring and $450 per hour for offsite review, analysis and

related tasks and for a nurse assistant: $2,000 per day for onsite monitoring and $250 for offsite review, analysis and related tasks; Dr. Stellman: $425 per hour plus $175 per hour for travel time; Dr. Schwartz: $225 per hour and Mr. Raney: $200 per hour.

5. With appropriate notice, the Court experts shall have reasonable access to all parts of any San Bernardino Jail and access to the facilities will not be unreasonably restricted. The experts shall have access to correctional and health care staff and inmates, including confidential and voluntary interviews as they deem appropriate. The experts shall also have access to documents, including budgetary, custody, and health care documents, and institutional meetings, proceedings, and programs to the extent the experts determine such access is needed to fulfill their obligations. The experts' tours shall be undertaken in a manner that does not unreasonably interfere with jail operations as reasonably determined by jail administrators.

6. The Court experts may engage in ex parte communications with the parties, as requested. However, all of the experts' findings and recommendations shall be set forth in writing in their reports.

7. Pursuant to the dispute resolution procedures set forth in the Consent Decree either party may request that the relevant Court expert evaluate the issue in dispute and prepare a report. The expert must provide the report regarding the area of disagreement to the parties and the Mediator within 45 days of the request. Defendant will pay the experts' reasonable fees for any reports prepared by a Court expert at the request of a party about a disputed issue, as contemplated by this paragraph.

# EXHIBIT C

DONALD SPECTER (SBN 83925)
dspecter@prisonlaw.com
MARGOT MENDELSON (SBN 268583)
mmendelson@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

Attorneys for Plaintiff, *on behalf of himself and others similarly situated*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION – RIVERSIDE**

| | |
|---|---|
| RAHSHUN TURNER,<br>on behalf of himself and all others similarly situated,<br>*Plaintiff*,<br>v.<br>COUNTY OF SAN BERNARDINO,<br>*Defendant*. | Case No. 5:16−cv−00355−VAP−DTB<br><br>**STIPULATED PROTECTIVE ORDER** |

1. A. <u>PURPOSES AND LIMITATIONS</u>

Discovery in this action is likely to involve the production of confidential, proprietary or private information for which special protection from public disclosure and/or use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that

are entitled to confidential treatment under the applicable legal principles. Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

B. <u>GOOD CAUSE STATEMENT</u>

This action is likely to involve the need for access to confidential health records concerning prisoners in the custody of the San Bernardino County Jails. Records relevant to the resolution of this class action case may include medical, dental, and mental health records, appointment schedules, sick call slips, intake screening forms, and other documents containing protected health information. The parties agree that it is impractical to obtain authorizations or issue subpoenas to individual inmates for the disclosure of health records and that given the scope of the allegations in this class action, the volume of potentially relevant records is substantial. The parties further agree that spending time and limited resources obtaining authorizations or issuing subpoenas will slow the progress of discovery and increase the costs of litigation.

Accordingly, to expedite the flow of information, facilitate the prompt resolution of disputes over confidentiality of discovery materials, adequately protect the confidential health information of prisoners at the San Bernardino County Jails, ensure that the parties are permitted reasonable and necessary uses of such material in preparation for and in the conduct of trial, address the handling of such material at the end of the litigation, and serve the ends of justice, a protective order for such information is justified in this matter.

It is the intent of the parties that information will not be designated as confidential for tactical reasons and that nothing will be so designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case

C. <u>ACKNOWLEDGMENT OF PROCEDURE FOR FILING UNDER SEAL</u>

The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the

standards that will be applied when a party seeks permission from the court to file material under seal.

There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases. In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006); *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002); *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause or compelling reasons with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal. The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL does not— without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause.

Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected. *See Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order. Again, competent evidence supporting the application to file documents under seal must be provided by declaration.

Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted. If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document, shall be filed. Any application that seeks to file documents under seal in their entirety should include an

Case 5:16-cv-00355-VAP-DTB Document 30 Filed 10/06/16 Page 4 of 14 Page ID #:178

explanation of why redaction is not feasible.

2. DEFINITIONS

2.1 Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2 "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c) including, but not limited to, inmate medical, mental health, and dental records and/or documents referencing personnel-related matters that are protected from disclosure by state or federal law.

2.3 Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4 Designating Party: a Party or Non-Party that designates information or items

2.5 that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

2.6 Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7 Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

2.8 House Counsel: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.9 Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.10 Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in

this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.11 Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.12 Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.13 Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.14 Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL."

2.15 Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3. SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the

Case 5:16-cv-00355-VAP-DTB Document 30 Filed 10/06/16 Page 6 of 14 Page ID #:180

Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4. DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5. DESIGNATING PROTECTED MATERIAL

5.1 Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2 Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or

Case 5:16-cv-00355-VAP-DTB Document 30 Filed 10/06/16 Page 7 of 14 Page ID #:181

ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL" legend to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL." If only a portion or portions of the information or item warrant

protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3 Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

5.4 Failure to Designate Inmate Medical, Mental Health, and Dental Records. Notwithstanding anything to the contrary in the foregoing, any inmate, medical, mental health, or dental records produced pursuant to this Protective Order shall be deemed Confidential without regard to whether they have been so designated by the Producing Party, unless the inmate specifically waiver his/her rights to medical privacy in writing with respect to the record(s) at issue or the court orders otherwise.

6. CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1 Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2 Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by meeting and conferring in accordance with the process and timeframes set forth in Civil Local Rule 37-1.

6.3 Judicial Intervention. If the Parties cannot resolve a challenge without court

intervention, they shall formulate a written stipulation, unless otherwise ordered by the Court. The joint stipulation shall be filed and served with the notice of motion, in accordance with Civil Local Rule 37-2.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1 Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2 Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

Case 5:16-cv-00355-VAP-DTB Document 30 Filed 10/06/16 Page 10 of 14 Page ID #:184

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

8. PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is

Case 5:16-cv-00355-VAP-DTB Document 30 Filed 10/06/16 Page 11 of 14 Page ID #:185

subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

9. A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a) The terms of this Order are applicable to information produced by a Non-Party

in this action and designated as "CONFIDENTIAL." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3) make the information requested available for inspection by the Non-Party.

(c) If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

11. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to

Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

12. <u>MISCELLANEOUS</u>

12.1 <u>Right to Further Relief</u>. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

12.2 <u>Right to Assert Other Objections</u>. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3 <u>Filing Protected Material</u>. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5(d) is denied by the court, then the Receiving Party may file the information in the public record pursuant to Civil Local Rule 79-5(e) unless otherwise instructed by the court.

13. <u>FINAL DISPOSITION</u>

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of

Case 5:16-cv-00355-VAP-DTB Document 30 Filed 10/06/16 Page 14 of 14 Page ID #:188

the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Dated: October 6, 2016

PRISON LAW OFFICE
By: /s/ *Margot Mendelson*
Margot Mendelson
Donald Specter
*Attorneys for Plaintiffs*

Dated: October 6, 2016

FUTTERMAN DUPREE
DODD CROLEY MAIER LLP
By: /s/ *Martin Dodd*
Martin H. Dodd
*Attorneys for Defendant*
*San Bernardino County*

I hereby attest that all other signatories listed on this document, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

*/s/ Margot Mendelson*
Margot Mendelson
*Attorneys for Plaintiffs*

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, ________________________________ [print or type full name], of __________________ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Central District of California on [date] in the case of ____________ **[insert formal name of the case and the number and initials assigned to it by the court]**. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Central District of California for enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint __________________________ [print or type full name] of _______________________________________ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: ______________________________________

City and State where sworn and signed: _________________________________

Printed name: _______________________________

Signature: __________________________________

DONALD SPECTER (SBN 83925)
dspecter@prisonlaw.com
MARGOT MENDELSON (SBN 268583)
mmendelson@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

Attorneys for Plaintiff, *on behalf of himself and others similarly situated*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION - RIVERSIDE**

| | |
|---|---|
| RAHSHUN TURNER,<br>on behalf of himself and all others similarly situated,<br>*Plaintiff*,<br>v.<br>COUNTY OF SAN BERNARDINO,<br>*Defendant*. | Case No. 5:16−cv−00355−VAP−DTB<br><br>[~~PROPOSED~~] ORDER |

Pursuant to the parties' stipulation, it is hereby ORDERED that the parties' stipulated protective order (Dkt #30) shall take effect.

DATED: October 18, 2016

THE HONORABLE DAVID T. BRISTOW
United States Magistrate Court Judge